Otis Beall Kent v. Commissioner.
Kent v. Commissioner
Docket No. 37332.
United States Tax Court
1953 Tax Ct. Memo LEXIS 10; 12 T.C.M. (CCH) 1491; T.C.M. (RIA) 54011; December 31, 1953
*10 1. Held, petitioner was engaged in the "trade or business" of farming for profit during the taxable year 1947. Sections 23 (a) (1) (A) and 23 (1) (1) of the Internal Revenue Code. 2. Held, expenditures for gatekeeper's salary and electricity, gas and fuel oil (some of which was used to heat vacant farm superintendent's house in order to prevent freezing of water pipes) were "ordinary and necessary" business expenses under Sec. 23 (a) (1) (A), I.R.C.
3. Held: (a) depreciation deduction on tenant house disallowed because useful economic life of that farm structure had terminated prior to 1947; (b) unadjusted basis of barn (for depreciation purposes) found to be $5,000, rather than $10,000 as claimed by petitioner; (c) farm structures not in active use during 1947 found nevertheless to be "used in trade or business" for Sec. 23 (1), I.R.C., depreciation purposes; (d) prior "allowable" depreciation deductions taken into account in determining adjusted basis for depreciation under Sec. 113 (b) (1) (B), I.R.C., and (e) useful economic life of certain assets redetermined for depreciation purposes. 4. Contractor, employed by petitioner to rehabilitate Manor House (petitioner's residence), *11 committed various breaches of contract and acts of negligence, and allegedly embezzled some of petitioner's funds. A written agreement was signed in a prior year whereby petitioner accepted $3,500 in settlement of claims against contractor arising out of criminality. Also, under the agreement, petitioner and contractor's attorney were to cooperate in preparing and filing a suit against contractor for damages (in an amount they were to settle upon) arising out of the breaches of contract and negligence, and contractor was to confess judgment thereto. The suit was never filed and contractor became insolvent. Held, petitioner had merely an unliquidated and unadjudicated claim against contractor. He could not deduct the loss therefrom, either as a worthless debt under Sec. 23 (k)(1) or ( 4), I.R.C., or as a "loss" under Sec. 23 (e) from theft incurred in trade or business, or incurred in transaction entered into for profit. Byron N. Scott, Esq., 1025 Vermont Avenue, North West, Washington, D.C., for the petitioner. Reuben C. Clark, Esq., for the respondent. BLACK has determined a deficiency of $10,524.61 in petitioner's income tax for the calendar year 1947 resulting from the following *12 adjustments in petitioner's return: (a) disallowance of deductions of $2,896.10 for depreciation and $1,388.59 for other expenses incurred in the operation of a farm, thereby negating a net farm loss deduction of $3,194.69; (b) disallowance of a $15,000 bad debt deduction; and (c) reduction of adjusted gross income by $1,486.68 to correct for petitioner's overstatement of net capital gains. Petitioner contests all but the last mentioned adjustment (which is in his favor) and thereby raises the following questions for decision: 1. Was petitioner engaged in the "trade or business" of farming within the meaning of sections 23 (a) (1) (A) and 23 (1) (1) of the Code so as to entitle him to deduct expenses and depreciation incurred in connection therewith? 2. If the answer to the preceding question is in the affirmative, were the expenses deducted by petitioner "ordinary and necessary" within the meaning of section 23 (a) (1) (A) of the Code, and were the depreciation deductions "reasonable" within the meaning of section 23 (1)? 3. (a) Was Frank I. Koplin indebted to petitioner in the amount of $15,000 (or any other sum) and, if so, was that debt a business or a nonbusiness debt, section 23 (k) (1) *13 or (4)? (b) If no debt arose, did petitioner sustain a loss of $15,000 (or any other sum) which loss was either incurred in his "trade or business" (section 23 (e) (1)), incurred in a transaction entered into for profit (section 23 (e) (2)), or resulted from theft (section 23 (e) (3))? 4. If a business or nonbusiness debt arose (as postulated in 3 (a) above) did it become worthless in 1947? If a loss was sustained (as postulated in 3 (b) above) was it sustained in 1947? Findings of Fact Petitioner is an individual residing at Kentland Farms, Montgomery County, Maryland. He computed his income for 1947 on the cash receipts and disbursements basis and filed his return for that year with the Collector of Internal Revenue for the District of Maryland. I. Farming Business Petitioner is 67 years of age and unmarried. For 14 years, beginning in 1905, he was employed in a variety of positions by the United States Government. He left Government service in 1918 to engage in the private practice of law in Washington, D.C. After 22 years of successful practice during which he amassed a considerable amount of wealth, some of which was invested in income-producing real estate and securities, petitioner *14 retired on October 31, 1940. Since early youth petitioner desired to become a successful practical farmer and the owner of a modern and profitable farm. To realize that ambition in large part, was the cause of his retirement from active legal practice. Petitioner's aim was to purchase a farm which, through later acquisitions of circumjacent land, could eventually be expanded to about 1,500 acres. With this in mind, petitioner inspected, during the year following his retirement, numerous farms within a 200-mile radius of Washington. In 1942, petitioner considered buying a 140-acre farm which was in excellent condition and was located right outside Washington. He did not purchase that farm, however, because the United States Department of Agriculture County Agent for Montgomery County, Maryland, advised him that it was not suited for profitable large scale farming, although it would be an excellent speculative investment because of the anticipated need for land on which to build apartment house projects right outside Washington. Acting on the county agent's advice petitioner subsequently, on July 1, 1942, purchased for $54,000 the 601-acre Tschiffely Farm, located about seven miles north *15 of Rockville, Maryland. Although highly fertile the farm had not been cultivated for 13 years and, except for 200 acres of woodland and waterways, and some meadowland, was fallow. The structures on that farm, which were mostly brick, were in a state of disrepair and the Manor House, which petitioner planned to use as a residence, was uninhabitable. Petitioner renamed this farm the Manor Farm, and it will hereinafter be referred to as such. Before the close of 1942, petitioner also made the following purchases: Name
Acreage
Price
Date of Purchase
Fulks Farm
165 1/2
$15,241.00
July 27, 1942
Crown Farm
115 1/2
17,558.05
December 31, 1942
Ward Farm
143
unstated
1942
(unnamed)
1
2,300.00
1942 As a result of these purchases petitioner owned, along with the Manor Farm, 1,026 acres of contiguous farmland located within four bordering roads and for which he paid approximately $100,000. He named the combined property Kentland Farms. The land on the four last acquisitions was, as with the Manor Farm, in a poor state of cultivation, though reported by the county agent to be fertile. There were old structures of frame construction on the Fulks and Crown Farms but no depreciable structures on the Ward and one-acre *16 farms. Immediately following his purchase of the Manor Farm petitioner applied to the Montgomery County Office of the War Production Board (W.P.B.) for permission to purchase farm machinery and building materials (the latter to rehabilitate farm structures), both of which were scarce. The W.P.B. was satisfied that petitioner intended to operate the farm as a practical unit and to produce sufficient quantities of food to justify his request. Consequently, the W.P.B. allotted petitioner a complete line of heavy farm machinery (which was necessary to work a farm of that size) and specified a sum which petitioner would be allowed to expend for scarce building materials. Since petitioner had no experience whatever as a practical farmer he continually consulted the county agent on problems relating to his farm and, specifically, was advised as to the type of farm machinery he would need. Although he was granted the necessary allotment by the W.P.B. and diligently endeavored to acquire the machinery needed, he was unable to do so because of scarcities which lasted until after 1948. In 1943, petitioner did purchase two large tractors and accessories from a dealer in Falls Church, Virginia, *17 but lost them when the dealer, without authority, removed them from petitioner's land and sold them to another purchaser for a higher price. The dealer offered petitioner the profit realized on the resale but petitioner turned it down, instructing the dealer instead to obtain for him the desired machinery. Because of the maximum use to which farm machinery was being put during the years of World War II petitioner made no attempt to rent any. As a result, until 1951 (after which he purchased $80,000 worth of equipment), petitioner had only one "cub" tractor, too small to be of any use, a 48-inch sickle bar used to clear weeds, and two old dump trucks, one of which he sold in 1950. Petitioner also endeavored, but without success, to obtain competent farm labor. The only experienced farm managers available were those working for his neighbors and petitioner was unwilling to hire them away from those neighbors. Common labor was scarce and was difficult to obtain. Dating from his purchase of the farm petitioner has, however, retained an old couple as gatekeepers at a salary of $780 a year, plus living quarters in a gate lodge at the south gate. Their function is to keep out undesirables *18 and trespassers. In 1950, petitioner hired a farm manager at a salary of $6,000 per year, but he proved unsatisfactory. Since December 1, 1952, he has employed a manager who is doing an excellent job and for whom he is building a home and promising security in order to induce him to stay. Because lack of machinery and labor prevented his cultivation of Kentland Farms, petitioner leased the meadowland to a neighbor for grazing purposes. He also entered into arrangements with other farmers whereby they worked some of his acreage on a crop-sharing basis. His gross farm income for 1942 through 1947, derived solely from those grazing fees and cropsharing agreements, was as follows: 1942
$ 100.00
1943
495.00
1944
1,121.89
1945
1,350.00
1946
1,598.91
1947
1,090.00 Deductions for depreciation and other expenses consistently exceeded income, however, with the result that petitioner has shown a farm deficit for each of those years. Petitioner's adjusted gross income for 1942 through 1947, derived mostly from rents on real estate owned in Washington, D.C. and dividends and interest earned on securities was, after adjustments for the farm deficits, as follows: 1942
$34,685.92
1943
50,659.76
1944
57,629.46
1945
61,547.34
1946
61,823.37
1947
63,987.85
By *19 the date of the hearing petitioner had terminated most of his crop-sharing arrangements, had over 400 acres under cultivation, and was in the process of clearing an additional 150 acres for cultivation purposes. In 1943, following the receipt of permission from the W.P.B., petitioner began to rehabilitate the structures on Kentland Farms. All the reconstruction work was concentrated on the Manor Farm structures and was largely completed by the end of 1947. Situated on that farm was the Manor House (a large residence), barn, superintendent's house, gate lodge, seed house, milk shed, and barracks (a shelter for cattle). All the structures were brick. Petitioner spent about $100,000 rehabilitating the Manor House and constructing an attached 4-car garage. In the house itself he built oak floors, installed an automatic oil heater, title baths, library, elevator, electric range and refrigerator, and saw to it that other minor repairs and alterations were made. He moved into the house on June 30, 1946, when it first became habitable, though it was not finished until 1947. Prior thereto he had lived in Washington and traveled to the farm about twice a month. Petitioner has never claimed deductions *20 for depreciation on the Manor House and garage. The improvements petitioner made on the other structures were as follows: (1) a new roof on the barn, conversion of one of the barn's haylofts into an auditorium to be used as needed for farmers and 4-H Club meetings devoted to agricultural matters (if not so used that loft can be used to store hay), and conversion of part of the barn's floor into a paint shop, a plumbing shop and a machine shop with electric welding unit (installed in 1950) for use in repairing heavy farm machinery; (2) enlarging and moderization of the superintendent's house, supplying it with bath and toilet facilities, hot water, oil heat, and refrigeration; (3) rebuilding milk shed and conversion of it into a power house supplied by the electric company with 4-line, 3-phase service needed to run heavy duty, high speed machinery; and (4) rehabilitation of the gate lodge. In addition, petitioner purchased a hammermill machine used to grind crops into cattle feed and installed it in a brick building he constructed in 1945. He also installed in that building a grist mill, pressure cooker, and complete preserving unit to process crops. That machinery has not been in use, *21 except occasionally by the 4-H Club, and petitioner has never claimed depreciation on it. All of the improvements mentioned in this and the preceding paragraph (excluding the crop-grinding and food-processing machinery) cost petitioner about $70,400. Petitioner also spent $140,000 on the reconstruction of a road from the south gate to the Manor House, which would be strong enough and of the proper grade to accomodate large trucks and heavy farm machinery. He has never taken depreciation on that road. A small lake was formed by the removal of dirt for, and the grading up of, the road, which lake the State Game Commission uses as a fishspawning pool. Petitioner constructed kennels in which he keeps about 12 dogs. Depreciation has never been claimed on the kennels. There are no recreational facilities on Kentland Farms. From 1941 until 1950, petitioner was involved as a party in a series of lawsuits which prevented him from spending as much time attending to the farm matters as he otherwise would have. Petitioner, during 1947, was engaged in the business of farming for profit and is, therefore, entitled to deductions for depreciation and other expenses properly incurred and calculated *22 in connection therewith. II. Expenses Petitioner deducted $1,388.59 as farm expenses for 1947. That total amount was composed of the following elements: Salary to couple tending south gate
$780.00
Electricity for superintendent's house [1]
and gate lodge
88.25
Gasoline and fuel oil for trucks, ma-
chines, superintendent's house [1] and
gate lodge
520.34 These were ordinary and necessary expenses paid in carrying on petitioner's farming business. Depreciation 1. Petitioner capitalized the frame structures on the Fulks Farm as follows: Tenant house
$1,800
Barracks (for cattle)
300
Barn
100
Sheds
41
Total unadjusted basis
$2,241 He depreciated them on a straight-line basis over a 10-year period (10 per cent per year), deducting $224.10 for 1947. The tenant house was over 100 years old when acquired by petitioner, was of frame construction, and was in a dilapidated and uninhabitable state. Petitioner permitted an indigent local character to reside there rent-free and never made any attempt to rehabilitate or use the structure. In fact, it finally collapsed in a high wind. Some time *23 prior to 1947, the useful economic life of the tenant house had expired and as a result it was not an asset for which depreciation deductions might properly be taken in that year. The correct unadjusted basis of the remaining structures on the Fulks Farm is $441 and depreciation of them over a period of 10 years is proper. 2. Petitioner capitalized the frame structures on the Crown Farm, as follows: Tenant house
$3,200
Barn
500
Sheds, etc.
300
Total unadjusted basis
$4,000 He depreciated them on a straight-line basis over a 20-year period (five per cent per year) deducting $200 for 1947. Part of the acreage of the Crown Farm was leased by petitioner to another farmer on a crop-sharing basis. The lease included the structures, which were actually used by that other farmer. In fact, that farmer quartered some of his labor in the tenant house, which was over 80 years old. That house, subsequent to 1947, collapsed when hit by a bulldozer. We find the unadjusted basis and the depreciation rate determined by petitioner for the structures on the Crown Farm to be correct and, consequently, the $200 deduction claimed by him proper. 3. For depreciation purposes petitioner, in 1943, capitalized the *24 brick structures on the Manor Farm, as follows: Barn
$10,000
Superintendent's house
1,300
Gate lodge
500
Barracks (for cattle)
150
Seed house
50
Total unadjusted basis
$12,000 He capitalized the Manor House at $7,000, but properly never claimed depreciation on it since it was used as a residence by him and not in his trade or business. He assigned no value to the milk shed. Prior to 1947, petitioner depreciated those structures on a straight-line basis over a 33 1/3-year period (3 per cent per year), taking yearly deductions of $360 ($12,000 X 3%) for 1943 through 1946. Although he acquired the Manor Farm on July 1, 1942, he took no depreciation deduction for the six remaining months of that year. On his 1947 return he listed $1,440 ( $360 X 4) as the total allowed or allowable depreciation for prior years. Petitioner, we have found, expended $70,400 between 1943 and 1947 in rehabilitating and adding to the depreciable structures on the Manor Farm. Considering that property as a group, which is how petitioner elected to calculate depreciation on it, [2] we find that the improvements and additions were completed and ready for use by the beginning of 1947, which is the first year petitioner claimed *25 depreciation deductions therefor. For that year petitioner claimed a deduction of $2,472, which is three per cent of $82,400 ($12,000 unadjusted basis plus $70,400 spent on rehabilitation and improvements). As above noted petitioner, in 1943, capitalized the barn at $10,000 for depreciation purposes. However, in setting up his "Capital Account" for the Manor Farm in 1942, the year of its acquisition, he capitalized the barn at $5,000. Petitioner gave no explanation for revaluing the barn at $10,000 in 1943, nor was there any evidence in support of that revaluation. We find the original capitalization at $5,000 to be correct. Petitioner's correct unadjusted basis for the group of depreciable structures on the Manor Farm was, therefore, $7,000 rather than $12,000. His adjusted basis for those structures as of the end of 1947 was, as follows: $ 7,000
Unadjusted basis
Plus
70,400
Improvements and Additions
$77,400
Less
1,440
Depreciation "allowed" from Janu-
ary 1, 1943 through December 31,
1946, on claimed unadjusted basis
of $12,000 (greater than amount
"allowable" from July 1, 1942
through December 31, 1946 on cor-
rect unadjusted basis of $7,000).
$75,960
Adjusted basis, December 31, 1947
As *26 a result of the improvements and additions made by petitioner, the useful economic life of the aforementioned group of depreciable structures on the Manor Farm is 33 1/3 years from January 1, 1947. The correct depreciation deduction for 1947 is, therefore, three per cent of the $75,960 adjusted basis, or $2,278.80, rather than the $2,472 claimed by petitioner. Summation The following is a summation of the farm expenses, depreciation deductions, and net loss claimed in petitioner's return for 1947 and our findings regarding those items: Petitioner's Return
Findings
Expenses
$1,388.59
$1,388.59
Depreciation: Fulks Farm
$ 224.10
$ 44.10
Crown Farm
200.00
200.00
Manor Farm
2,472.00
2,278.80
Total Depreciation
2,896.10
2,522.90
Total Deductions
$4,284.69
$3,911.49
Less: Gross Farm Income
1,090.00
1,090.00
Net Farm Loss
$3,194.69
$2,821.49
III. Bad Debt Deduction In 1942, following his purchase of the Manor Farm, petitioner entered into a verbal contract with Frank I. Koplin, a building contractor who was well recommended to petitioner. Koplin was to restore the Manor House and be compensated therefor on the basis of builder's cost of labor and materials plus 10 per cent of that cost. By August 1943, petitioner *27 had paid Koplin $28,144.44. At that time he discovered that Koplin had charged him $4,447.82 for materials which were never delivered and $2,579.10 in commissions and overcharges, although the agreement was that no commissions or charges were to be added to builder's cost of materials. In addition, petitioner claims that he suffered losses of $10,411.84 resulting from various breaches of contract and acts of negligence by Koplin. Petitioner also claims that a plumbing contract entered into with a contractor recommended by Koplin, and later repudiated by that contractor, caused him losses of $3,045.01 in overpayments and that Koplin is liable therefor. These claimed losses totaled $20,483.77. Petitioner considered bringing criminal charges against Koplin for embezzlement and false pretenses. On August 3, 1944, a meeting was held in the office of Detective Lieutenant Joseph Shimon, Chief, Department of Investigation, United States Attorney's Office, Washington, D.C., between petitioner, Koplin, James Juliano (Koplin's partner), and Koplin's attorney. In return for a cash payment by Koplin of $3,500 and the entering into of a certain agreement, petitioner did not institute criminal proceedings. *28 That agreement, omitting certain formal parts, is set forth below: "Washington, D.C., August 3, 1944. "RECEIVED this date from FRANK I. KOPLIN, through his attorney FRANK PALEY, the sum of Three Thousand Five Hundred Dollars ($3500.00), in full and final accord, settlement and satisfaction of all claims heretofore asserted by the undersigned OTIS BEALL KENT, against said FRANK I. KOPLIN and against JAMES JULIANO, and based upon charges and implications of criminality, in connection with certain contracts and agreements whereunder certain materials have been furnished and certain labor performed at and on the property of said OTIS BEALL KENT near Quince Orchard, Montgomery County, Maryland; it being hereby expressly agreed and understood that the aforesaid KOPLIN and JULIANO hereby expressly release said OTIS BEALL KENT, of and from all claims which otherwise they and/or any other contractor, sub-contractor or materialman might have asserted against said OTIS BEALL KENT, in the premises aforesaid; and it being further hereby agreed and understood that the said OTIS BEALL KENT and the aforesaid FRANK PALEY, attorney as aforesaid, shall collaborate in the preparation of a civil suit to *29 be duly filed against the aforesaid KOPLIN for the recovery of certain damages and losses arising out of and attributable to certain breaches of contract, as to performance only, and negligence in the purchase of the aforesaid materials and in the rendition of the aforesaid building and construction services, and that said KOPLIN shall admit the allegations to be embodied in the aforesaid suit, as aforesaid, and to confess judgment with respect thereto." The $3,500 cash payment reduced petitioner's claimed loss from $20,483.77 to $16,983.77. Paley and petitioner were supposed to reach an agreement as to the exact amount of Koplin's liability and to prepare and file the suit in which Koplin had agreed to confess judgment. Although they were casually in contact with each other in 1945 and 1946, they never got together for that purpose. In 1947, Paley informed petitioner that Koplin had many judgments already outstanding against him and, in fact, was insolvent and judgment proof. A collateral investigation by petitioner confirmed this and we are satisfied that Koplin was insolvent in 1947, and thereafter. On his 1947 return petitioner, of his own accord, reduced the $16,983.77 figure *30 to $15,000, and took a deduction therefor which he labeled as "Losses from thefts and worthless debts." Petitioner states that in 1944 he presented to Koplin an itemized listing of his claim and that Koplin retained that list for a reasonable time (until 1947) without making any objection thereto. Consequently, claims petitioner, that list ripened into an account stated which created a debtor-creditor relationship between petitioner and Koplin for a business debt in the amount of $16,983.77, which debt became worthless in 1947. We find, first of all, that Koplin's defalcation related to work performed on the Manor House and the attached garage, which were nonbusiness property. A deduction for a business bad debt is, therefore, in no case proper. Moreover, we find that in fact no debt at all existed between Koplin and petitioner. No part of the claim here involved was due to embezzlement or false pretenses, since the agreement of August 3, 1944 settled all issues regarding criminality. We find, therefore, that since no debt existed a deduction based on a claim that such debt became worthless in 1947 is not sustained. Finally, since we have above found that no part of petitioner's claim *31 was due to embezzlement or false pretenses, and since that claim was not incurred in trade or business or in a transaction entered into for profit (it having arisen solely out of work done on the Manor House and garage, petitioner's residence), no deductible loss was realized by petitioner. Opinion BLACK, Judge: I. "Trade or Business" of Farming To be entitled to deductions for the expenses and depreciation incurred in his farming operation, and an adjustment for the consequent net farm loss, it must be established that petitioner was engaged in farming as a "trade or business." The applicable provisions of the Internal Revenue Code and Treasury Regulations bearing on this issue are printed in the margin. [3] *32 *33 Whether or not petitioner's activities constitute the carrying on of a trade or business is a question of fact in which the burden of proof rests upon petitioner. Higgins v. Commissioner, 312 U.S. 212; Commissioner v. Stokes' Estate (C.A. 3), 200 Fed. (2d) 637; Wilson v. Eisner (C.A. 2), 282 Fed. (2d) 38. It is settled law that the answer to that question turns upon whether petitioner intended to engage in farming for a profit or merely for pleasure. Thacher v. Lowe (D.C.S.D.N.Y.), 288 Fed. (2d) 994; Edwin S. George, 22 B.T.A. 189. We have found as a fact that petitioner intended to operate his farm for profit. This intent was present from the outset of the venture. Tatt v. Commissioner (C.A. 5), 166 Fed. (2d) 697. *34 It was evidenced by his continued consultations with the Department of Agriculture county agent regarding the purchase of land that could be successfully farmed, the type of machinery to buy, and other farm problems. Irving C. Ackerman, 24 B.T.A. 512; affd. (C.A. 9) 71 Fed. (2d) 586; Margaret E. Amory, 22 B.T.A. 1398. It was also evidenced by his heavy investments in rehabilitating and adding to the business structures and facilities on the Manor Farm, the construction of a road to accommodate heavy trucks and farm machinery, his attempts to secure machinery and labor, and his decision to at least share-crop some of his land when his efforts to secure those essentials failed. Doggett v. Burnet (C.A.D.C.), 65 Fed. (2d) 191. It is true that Kentland Farms operated at a loss from the time of its acquisition by petitioner in 1942, through 1947, and that a continuing lack of profits is an important factor bearing upon a taxpayer's true intention. Thacher v. Lowe, supra; Deering v. Blair (C.A.D.C.), 23 Fed. (2d) 975. However, operation at a loss "is not controlling if the other evidence shows that there is a true intention of eventually making a profit." Norton L. Smith, 9 T.C. 1150, 1155, *35 even though the taxpayer's belief that a profit will be realized may be unreasonable. Doggett v. Burnet, supra.We are convinced that the other evidence does indicate that petitioner had the requisite intent. Furthermore, explanation for the continued losses are here obvious - in brief, the inability to get the necessary machinery and labor to operate the farm due to shortages precipitated by World War II. Considering all the aforementioned evidence, we feel that petitioner's testimony to the effect that he intended to operate Kentland Farms as a practical business venture for profit stands uncontradicted. We hold that petitioner has successfully carried his burden of proof on this issue. II. Expenses Petitioner is entitled to deduct "all the ordinary and necessary expenses paid or incurred" during 1947 "in carrying on" his farming business, "including a reasonable allowance for salaries * * * for personal services actually rendered." Section 23 (a) (1) (A), Internal Revenue Code, Treasury Regulations 111, section 29.23(a)-1. This means that petitioner, in effect, may deduct all expenses which are directly connected with or proximately result from his farming business. Kornhauser v. United States, 276 U.S. 145, *36 so long as those expenses are "ordinary and necessary." An expense is "ordinary" if, given the transaction out of which the expense arose, the general and accepted practice for the particular business would be to incur that expense. It is "necessary" if it is appropriate and helpful. Welch v. Helvering, 290 U.S. 111; Deputy v. Du Pont, 308 U.S. 488; Commissioner v. Heininger, 320 U.S. 467. Petitioner claimed the following deductions for expenses which, we find, were directly connected with or proximately resulted from his farming business: Salary to couple tending south gate
$ 780.00
Electricity for superintendent's house
and gate lodge
88.25
Gasoline and fuel oil for trucks, ma-
chines, superintendent's house and
gate lodge
520.34
Total
$1,388.59
If the $780 salary payment was for services actually rendered and was reasonable under all the circumstances, it meets the requirements and is properly deductible. Treasury Regulations 111, section 29.23 (a)-6. This is a question of fact in the determination of which we may exercise our own judgment. Doernbecher Mfg. Co. v. Commissioner (C.A. 9), 94 [95] Fed. (2d) 296. We hold that it was reasonable for petitioner to employ gatekeepers for such *37 a large farm. Moreover, the amount of salary paid was not excessive nor is there any doubt that the particular services were actually rendered. Similarly, we hold that the expenditures for electricity, gasoline, and fuel oil were "ordinary and necessary". Although the cost of electricity and fuel oil allocated to the superintendent's house and gate lodge were estimates, we find them to be reasonable and, therefore, acceptable. Joseph Kahn, 38 B.T.A. 1417; Lamar v. Granger, 99 Fed. Supp. 17 (D.C.W.D. Pa.). Moreover, the fact that the superintendent's house was not in use during 1947 does not preclude the taking of deductions for expenses incurred, as here, to maintain that business property. [4] 50 East 75th Street Corp. v. Commissioner (C.A. 2), 78 Fed. (2d) 158; Biscayne Trust Co., Executor, 18 B.T.A. 1015. Accordingly, we are of the opinion that petitioner has sustained the burden of proving the propriety of the claimed expense deductions totaling $1,388.59. Depreciation Petitioner is entitled to deduct a "reasonable allowance" for *38 depreciation "of property used in the trade or business" of farming, section 23 (1) (1), I.R.C.
For each of the three farms on which there were depreciable structures (Manor, Fulks, and Crown) petitioner set up a separate group capital account, including in it the depreciable structures and depreciating all the structures in the group at the same rate. Under the circumstances this method of depreciation was proper. [5] Petitioner (with the exception of the tenant house on the Fulks Farm) included in each group account and claimed depreciation only on property "used in the * * * business," as is required by the Code. Although it appears that the structures on the Manor and Fulks Farms were not in actual use during 1947, they are nevertheless regarded as "used in the * * * business" for purposes of depreciation since they were devoted to the business and stood ready for use should the occasion arise. P. Dougherty Co. v. Commissioner (C.A. 4), 159 Fed. (2d) 269, certiorari denied 331 U.S. 838; Yellow Cab Co. of Pittsburgh v. Driscoll (D.C.W.D. Pa.), 24 Fed. Supp. 993. Petitioner properly did not include the Manor House and garage in the group account for the Manor Farm since they were *39 not used in the business but as a residence and garage. Treasury Regulations 111, section 29.23 (1)-2, 10; Bradley v. Commissioner (C.A. 7), 184 Fed. (2d) 860, affirming a Tax Court memorandum opinion.
We have found and so hold that the depreciation deduction claimed by petitioner in regard to the Crown Farm property was proper and in accord with applicable principles. However, our findings led to adjustments of the deductions taken on the Fulks and Manor Farm properties. The adjustments will be given effect in a recomputation under Rule 50. Regarding the Fulks Farm, our findings of fact indicate that the useful economic life of the tenant house located thereon had terminated sometime prior to 1947. Depreciation deductions may not extend beyond the useful economic life of the property which, in many cases, may be shorter than the property's physical life. Treasury Regulations 111, section 29.23(1)-1, 5; *40 Adda, Inc., 9 T.C. 199; First National Bank in Mobile, 30 B.T.A. 632. As stated by the court in Cohen v. Lowe, 234 Fed. 474, 476 (D.C.S.D.N.Y.), depreciation "is to be based on the life of the building, in the sense of the number of years the building would remain in a condition to be habitable for the uses for which it was constructed and used." The findings clearly show that the 100-year-old frame tenant house was not habitable for use as a farm structure. Moreover, since we are convinced that that fact was evident at the close of 1947, it cannot be urged that the deduction was reasonable in light of the conditions then known to exist. Treasury Regulations 111, section 29.23 (1)-5; Leonard Refineries, Inc., 11 T.C. 1000. Between 1943 and the end of 1947, petitioner spent $70,400 in improvements and additions to the depreciable property on the Manor Farm. He also, from 1942 through the end of 1946, claimed and was allowed a total of $1,440 in depreciation on his original unadjusted basis of $12,000. No depreciation was taken before 1947, and properly so, on any of the improvements or additions since they were not ready for use until that year. Mobile Light & Railroad Co., 23 B.T.A. 543. *41 At the end of 1947, petitioner's adjusted basis for the depreciable property on the Manor Farm was $75,960. This we have determined by adding to $7,000 (the correct unadjusted basis) the $70,400 spent on improvements and additions, and subtracting from the total of those two figures the $1,440 allowed in depreciation deductions prior to 1947. Section 113 (b) (1) (A), (B), Internal Revenue Code. We have also found that, as a result of the improvements and additions made by petitioner, the useful economic life of the Manor Farm properties was 33 1/3 years from January 1, 1947 (rather than 28 1/3 years as reported on petitioner's 1947 return) and, consequently, that three per cent is the correct rate of depreciation. Disregarding salvage value as we may properly do in this case, Terminal Realty Corporation, 32 B.T.A. 623, 629, [6] and applying the three per cent depreciation rate to the $75,960 adjusted basis, we arrive at $2,278.80 as the allowable depreciation deduction for the Manor Farm properties.
III. *42 Bad Debt Deduction. In 1942, petitioner entered into a verbal contract with Frank I. Koplin, a building contractor, for the latter to restore the Manor House (petitioner's residence) on the basis of cost-plus-fixed-fee of 10 per cent. Petitioner paid Koplin $28,144.44 on that contract by August 1943. Petitioner claimed that Koplin had illegally charged him for materials which had never been delivered, illegally overcharged him for certain materials which had been delivered, committed various breaches of contract and acts of negligence, and was legally responsible for loss resulting from repudiation of a contract by a plumber whom he had recommended to petitioner. The total claim against Koplin was $20,483.77. Petitioner considered filing criminal charges against Koplin for embezzlement and false pretenses. However, on August 3, 1944, Koplin paid petitioner $3,500 reducing the amount claimed by petitioner to $16,983.77, and an agreement between those two parties and James Juliano (Koplin's partner) was signed wherein it was stated that the $3,500 was "in full and final accord, settlement and satisfaction of all claims heretofore asserted by * * * [petitioner against Koplin and Juliano] *43 and based upon charges and implications of criminality, in connection with certain contracts and agreements." The agreement went on to state that petitioner and Koplin's attorney (Frank Paley), "shall collaborate in the preparation of a civil suit to be duly filed against the aforesaid KOPLIN for the recovery of certain damages and losses arising out of * * * certain breaches of contract, as to performance only, and negligence * * * and that said KOPLIN shall * * * confess judgment with respect thereto." It was understood by the parties that petitioner and Paley were to meet not only to work out the technicalities of preparing and filing the suit, but also to agree upon the amount of money for which Koplin would confess judgment. [7] *44 This was never done, however, and in 1947 petitioner determined that he could never recover the $16,983.77 which he claimed from Koplin, because the latter was insolvent. Petitioner thereupon of his own accord reduced the amount of the claim to $15,000 and deducted that sum from adjusted gross income on his 1947 return as "Losses from thefts and worthless debts." Petitioner contends that the $15,000 constituted a business debt which became worthless in 1947 and, therefore, was deductible in full at that time under section 23 (k) (1) of the Code. I.R.C., section 23 (k) (1), (4). [8] *45 We have found that the alleged debt arose out of work done by Koplin on the Manor House and attached garage, which were used by petitioner as a personal residence and private garage. If the Manor House was used by petitioner in the conduct of the farm business (e.g., to interview employees or go over accounts) such use has not been demonstrated by petitioner and, in any event, would seem to be too slight to merit consideration. See A. R. Calvelli, 43 B.T.A. 6. Consequently, since the claimed loss resulting from the alleged debt had no proximate relation to petitioner's farming business, the loss cannot be treated as one from worthlessness of a business debt. Estate of Theodore Gutman, 18 T.C. 112; Robert Cluett, III, 8 T.C. 1178. Our decision on petitioner's aforementioned contention could rest equally as well on another point, the disposal of which also settles any question regarding treatment of the claim as a nonbusiness bad debt under section 23 (k) (4) of the Code. Before a bad debt deduction can be allowed the existence of a valid debt must first be established. Philip H. Schaff, 46 B.T.A. 640. *46 We hold that, in fact, no debt here ran from Koplin to petitioner. Petitioner was merely the holder of an unliquidated and unadjudicated claim against Koplin. In his brief petitioner relies on Douglas County Light & Water Co. v. Commissioner (C.A. 9), 43 Fed. (2d) 904, and similar cases, to the effect that if an embezzler gives the taxpayer victim a note covering the embezzled funds or agrees to repay the taxpayer, and the taxpayer acquiesces in those arrangements, a debt is thereby created and the taxpayer may take a bad debt deduction if and when that debt subsequently becomes worthless. The principles laid down in those cases are not, however, applicable to the facts before us. Here there is no embezzlement involved. The agreement of August 3, 1944, is clear that the $3,500 paid petitioner by Koplin on that date was in full settlement of all claims based upon "charges and implications of criminality." The agreement also establishes that Koplin agreed to confess judgment in a lawsuit for the recovery of damages arising only out of "certain breaches of contract, as to performance only, and negligence." Petitioner also quotes the court's opinion in Birdsboro Steel Foundry & Machine Co. v. United States (Ct. Cl.), 3 Fed. Supp. 640, 644, *47 to the effect that a debtor-creditor relationship arises where "one person, by contract or law, is liable or bound to pay another an amount of money, certain or uncertain." That court, however, went on to say in the same paragraph that the alleged debt "must be an outstanding obligation, which, if not due at the time, will certainly become due at some future date." (Italics supplied.) The Birdsboro case, supra, therefore, is in line with those decisions holding that a debt, within the meaning of section 23 (k) of the Code, is an unconditional obligation to pay, and that a debt does not arise where the obligation to repay is subject to a contingency which has not occurred. Agarano v. United States (D.C.D. of Hawaii), 110 Fed. Supp. 609; Gilman v. Commissioner (C.A. 8), 53 Fed. (2d) 47; Bercaw v. Commissioner (C.A. 4), 165 Fed. (2d) 521; Evans Clark, 18 T.C. 780, affd. (C.A. 2) per curiam, 205 Fed. (2d) 353. The August 3, 1944 agreement was no more than a stipulation to settle petitioner's claim against Koplin and to convert that settlement into a judgment. Koplin's obligation to pay was accordingly contingent upon that settlement and, at least until such settlement, no debt arose. *48 Certainly petitioner could not have sued and recovered any sum on the agreement above without litigation of the issues regarding breach of contract and negligence. Moreover, even if we assume that the August 3, 1944 agreement constituted a concession by Koplin of liability for some undetermined amount, it does not automatically follow that that gave rise to a debt. Wadsworth Mfg. Co. v. Commissioner (C.A. 6), 44 Fed. (2d) 763; Katherine J. Hanes, 2 T.C. 213. All the facts and circumstances giving rise to the claim must be considered and here we find that, even assuming such an admission of liability by Koplin, the claim remained merely an unliquidated and unadjudicated one for breach of contract and negligence. See Lewellyn v. Electric Reduction Co., 275 U.S. 243; National Contracting Co. v. Commissioner (C.A. 8), 105 Fed. (2d) 488. Finally, petitioner maintains that in 1944 he gave Koplin an itemized account of the claims arising out of the breach of contract and negligence, that Koplin retained that account for a reasonable time (until 1947) without voicing any objection thereto, and that, consequently, an account stated arose creating a debtor-creditor relationship between *49 them. We cannot agree with this position. An account stated can only arise if there is a meeting of the minds between the parties as to the correctness of the balance due and owing. A definite and certain balance must be struck and it must be understood by the parties that the particular account is the final adjustment as to that balance. Nelson v. Chicago Mill & Lumber Co. (C.A. 8), 76 Fed. (2d) 17; Daube v. United States, 59 Fed. (2d) 842 (Ct. Cl.), affd. 289 U.S. 367; Pierce v. Pierce (199 Pa. 4), 48 A. 689; Cunningham v. United States (Ct. Cl.), 27 [26] Fed. Supp. 470; Associated Sales Co., Inc. v. Elmer E. Frost & Co. (Cal. Dist. C.A.), 10 Fed. (2d) 175. "A mere claim for unliquidated damages cannot form the basis of an account stated where there has been no actual settlement or adjustment between the parties", Miller v. Pyrites Co. (C.A. 4), 71 Fed. (2d) 804, 810. Moreover, although a meeting of the minds as to the correctness of the account rendered the debtor can be predicated upon a presumption of acquiescence from the debtor's silence beyond a reasonable time, that presumption is rebuttable, Chinn v. Lewin (57 App. D.C. 16), 16 Fed. (2d) 512, by evidence of other *50 facts such as that the debtor expected shortly to see the creditor. Pierce v. Pierce, supra.In the instant case it is clear that the account rendered to Koplin in 1944 did not state a final balance. As aforementioned, petitioner and Paley were to meet for the purpose of arriving at that balance. The evidence shows that they did not meet for that purpose. We have found that the alleged $15,000 loss was not incurred in petitioner's trade or business or in a transaction entered into for profit but, rather, was incurred in connection with the building of his personal residence and private garage. We have further found that the alleged loss did not arise from theft but from breaches of contract and negligence. Consequently, no claim can be made for a "loss" deduction under section 23 (e) (1), (2), or (3) of the Code, [9] since none of the requirements thereof are met. Cf. Wadsworth Mfg. Co. v. Commissioner, supra; Charles B. Bretzfelder et al., Executors, 21 B.T.A. 789. We conclude that the $15,000 deduction reported by petitioner for "Losses from thefts and worthless debts" must be disallowed, since it did not result from a debt becoming worthless nor is it a "loss" of the type for *51 which a deduction is allowed under section 23 (e) of the Code. Decision will be entered under Rule 50. Footnotes
1. Although the superintendent's house was unoccupied it was necessary to keep it heated to prevent the water pipes from freezing.↩
2. Treasury Regulations 111, section 29.23(1)-9↩; Bureau of Internal Revenue Bulletin "F" (Revised January 1942).
3. Internal Revenue Code. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * * Treasury Regulations 111. Sec. 29.22(a)-7. Gross income of farmers. - * * * All individuals, partnerships, or corporations that cultivate, operate, or manage farms for gain or profit, either as owners or tenants, are designated as farmers. A person cultivating or operating a farm for recreation or pleasure, the result of which is a continual loss from year to year, is not regarded as a farmer. * * * Sec. 29.23(a)-11. Expenses of farmers. - A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming * * * If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. * * * Sec. 29.23(1)-1. Depreciation. - A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business, * * * may be deducted from gross income. Sec. 29.23(1)-2. Depreciable property. - * * * The deduction of an allowance for depreciation is limited to property used in the taxpayer's trade or business. * * * Sec. 29.23(1)-10. Depreciation in case of farmers. - A reasonable allowance may be claimed on farm buildings (other than a dwelling occupied by the owner), farm machinery, and other physical property. * * *↩
4. As aforementioned, electricity and fuel oil expenses were incurred in heating the superintendent's house to prevent freezing of the water pipes.↩
5. Treasury Regulations 111, section 29.23(1)-9. See also, Internal Revenue Bureau Bulletin "F" (Revised January 1942): Depreciable Property Accounts * * *
(3) Group Accounts: Assets similar in kind which have approximately the same average useful lives are included in one account. * * *↩
6. "* * * If the probable salvage value can be estimated, it should be first deducted from cost, but if it can not be reasonably estimated, adjustment may be made for it later. * * *"↩
7. Petitioner: "* * * I discussed with Mr. Paley the question of meeting him at his convenience, and arriving with him at a definite understanding of the exact amounts for which this confessed judgment was to be entered." Transcript of Hearing, page 93.
8. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General rule. - Debts which become worthless within the taxable year, * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
9. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.↩