JOHN T. STEEN AND NELL D. STEEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4395–71.    Filed November 26, 1973.

*John W. Davidson* and *Leonard Leighton*, for the petitioners.
*Robert H. Jones*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1966 | $7,338.07 |
| 1967 | 7,393.31 |
| 1968 | 6,595.42 |
| 1969 | 5,894.82 |

Several issues have been disposed of by agreement of the parties. The only issue remaining for decision is whether the petitioners are

entitled to depreciation deductions in 1968 and 1969 for certain buildings located on a ranch.

### FINDINGS OF FACT

Some facts have been stipulated by the parties and are found accordingly. The various stipulations filed by the parties are incorporated herein by reference.

Petitioners John T. Steen and Nell D. Steen are husband and wife, residing in San Antonio, Tex. They timely filed their joint individual income tax returns for 1968 and 1969 with the district director of internal revenue in Austin, Tex.

In 1968 and 1969 petitioner John T. Steen owned, managed, and operated a life insurance company, four casualty insurance companies, two insurance agencies, a finance company, an investment corporation, a construction corporation, and five ranches. Mr. Steen purchased the 607-acre ranch known as the River Ranch in Bandera County, Tex., on the Medina River on May 1, 1968. He also owned the following ranches during the years in question:

|  | Acres |
|---|---|
| Bee Bluff Ranch, Bandera County, Tex | 872 |
| Bandera County Creek Ranch, Bandera County, Tex | 260 |
| Green Acres Ranch, Gonzales County, Tex | 437 |
| El Rancho Rio, Goliad County, Tex | 1,210 |

At the time of the purchase of the River Ranch, petitioners had a foreman, Thomas J. Pyka, in charge of the other Bandera County ranches. Pyka was also placed in charge of the River Ranch when it was purchased.

When petitioners acquired the River Ranch it had on it a rather large four-bedroom main house, a swimming pool, a pool house with two dressing rooms, a guesthouse with two bedrooms, a sitting room, and utility kitchen, a two-bedroom employee's dwelling house, hay and other barns, stable and wellhouse, implement shed, water wells and tanks, board fences and cattle grounds. The main house was fully furnished when petitioners bought the ranch and their purchase included the furnishings. A ranchhand and his wife were living in the employee's dwelling and petitioners employed them to stay on as caretaker for the property and the cattle on the ranch, as they had previously done. There were about 111 head of cattle on the ranch when petitioners bought it and they continued to maintain a herd of about the same size on this ranch.

Petitioners claimed a deduction for depreciation on all of the buildings on the ranch on their returns for 1968 and 1969. Respondent allowed the deduction for depreciation on all of the buildings

except the following four, to which petitioners assigned a cost basis as follows:

| | |
|---|---|
| Main house | $110,000 |
| Pool house | 22,750 |
| Guesthouse | 26,300 |
| Employee's dwelling | 7,500 |

Respondent does not question the basis for depreciation of these buildings but determined in the notice of deficiency that $5,551.67 and $8,327.50 of the farm depreciation claimed on the returns for the years 1968 and 1969, respectively, attributable to the above four buildings, "does not represent any ordinary and necessary business expense because it has not been established that assets on which this depreciation was claimed are used in a trade or business." On brief, respondent concedes that the depreciation claimed on the employees dwelling is allowable.

Petitioners, on all their ranches, operated what is known as a cow/calf operation. In a cow/calf operation, a herd of mother cows is maintained for breeding purposes, and the calves are sold for income when they are about 6 months old. In addition to taking care of the cattle, the usual incidental ranch operations such as fence maintenance, feed raising, and brush eradication were conducted in the years in question. Pyka was employed by petitioner as foreman of all three of the Bandera County ranches, which were operated as a unit, but he did not live at River Ranch.

Petitioners did keep five saddle horses at the River Ranch for use in the ranching operation in Bandera County. They also raised 80 or 100 acres of hay for feed to be used on the three ranches in Bandera County during the winter months.

Since its purchase petitioners have cleared 200 acres of land on the River Ranch to improve its productivity. The River Ranch was used as a headquarters for petitioners' Bandera County operations.

Petitioner John Steen went to the River Ranch during 1968 and 1969 to check on the operations of the ranch and to confer with his ranch foreman about the operations of all of the ranches about once a week. Petitioner Nell Steen accompanied her husband on these trips about once a month to check on the main house and other things. Petitioners would drive to the ranch from their home in San Antonio, a distance of about 45 miles. They occasionally stayed overnight in the main house on the ranch. No one lived in the main house, the guesthouse, or pool house, and except for the visits of petitioners, their family and friends, hereinafter mentioned, those buildings were unoccupied.

On his weekly trip to the River Ranch, petitioner would usually go first to the main house. Petitioner kept his ranch work clothes in the main house along with one personal suit of clothes. Petitioner usually met his foreman at the main house, although sometimes they met in one of the pastures and looked over the ranch operations before going to the main house. At the main house, petitioner and his foreman discussed the operations for the three ranches in Bandera County. They also discussed the ranch bills that were received at the River Ranch. They would then ride the ranch to inspect the cattle and see what needed to be done. These discussions sometimes took place while they were riding the ranch. The discussions between Steen and Pyka that took place in the main house generally occurred in the downstairs portion of the house. These meetings did not occur in any particular place in the house; they might take place in the kitchen, at the desk located in the house, or on the front porch. The main house did contain a work desk and telephone.

A normal day at the ranch for Steen during 1968 and 1969 would average between 4 to 8 hours including traveltime to and from San Antonio.

Petitioners did not use the main house as their permanent residence and tended to make rather limited use of it and its adjoining facilities, as did their children. Petitioners maintained rather detailed daily diaries of their activities for 1968 and 1969. Petitioners have made it a practice to keep such record books for a number of years. Nell Steen's diary contains entries showing certain dates when petitioners were present at the ranch with guests. John Steen's daily diary also reflects the times that petitioners had guests at the ranch and the dates when he made his weekly business trip to the ranch.

Steen's diary shows that he was physically present on the River Ranch on the following dates in 1968 and 1969:

| 1968 | 1969 |
|---|---|
| May 2, 8, 18, 22, and 26 | Jan. 3, 9, 12, 18, 25, and 31 |
| June 7, 15, 16, and 23 | Feb. 9, 12, 16, and 22 |
| July 1, 7, 13, 17, and 27 | Mar. 1, 2, 7, 15, 23, and 29 |
| Aug. 2, 10, 15, 24, and 31 | Apr. 4, 13, 19, and 26 |
| Sept. 1, 6, 15, 20, and 29 | May 10, 11, 18, 25, and 31 |
| Oct. 5, 9, 12, 18, and 28 | June 4, 8, 15, 21, and 29 |
| Nov. 2, 5, 10, 16, 17, 23, and 30 | July 5, 13, 15, 19, 25, and 30 |
| Dec. 7, 11, 21, 26, and 30 | Aug. 9, 10, 16, 23, and 30 |
| | Sept. 7, 13, 21, and 27 |
| | Oct. 2, 11, 19, 25, and 26 |
| | Nov. 9, 15, 16, 22, and 30 |
| | Dec. 7, 13, 17, 22, 26, and 30 |

This list of dates constitutes the times when petitioner went to conduct ranch business, occasionally accompanied by his wife.

The only other times petitioners made use of the main house, guesthouse, and pool house were when they brought guests to the ranch. In 1968, petitioners had guests at the ranch on 9 days. On 1 of the days, the guests were members of a large civic group, the San Antonio Chamber of Commerce. On the other 8 days, the guests, who are identified in Nell Steen's diary, were insurance customers or business associates of her husband, as well as friends of both petitioners. These guests spent 1 or 2 nights with petitioners at the ranch. Petitioners used the guesthouse and the mainhouse, if necessary, to accommodate these guests. In 1969 petitioners had guests at the River Ranch on 17 different days. On 3 of these days, the guests were members of large civic groups, the Alamo Kiwanis Club, the Alamo Roundup Club (Chamber of Commerce), and the Texas Cavaliers. On the remaining days in 1969, the guests, as enumerated in Nell Steen's diary, were insurance customers and business associates of her husband, and friends. Some of these guests spent the night at the ranch. In fact, during 1969, petitioners had overnight guests at the ranch on eight separate occasions.

### OPINION

The only issue for decision is whether petitioners are entitled to deductions for depreciation on the main house, the guesthouse, and the pool house on the River Ranch. Petitioners do not argue that these buildings qualify for depreciation as entertainment facilities used in connection with John Steen's insurance or real estate business under section 274, I.R.C. 1954,[1] or that the buildings were property held for the production of income, under section 167(a)(2). Petitioners do argue that these buildings were on the ranch when they bought it, that they bought the ranch and operated it as a business, that they do not occupy any of these buildings as their dwelling, and that they are entitled to depreciate these buildings as property used in a trade or business under section 167(a)(1) of the Code and section 1.167(a)–6 (b), Income Tax Regs. Respondent tacitly acknowledges that petitioners operate River Ranch as a business, but argues that none of these buildings are used in that business and that the main house is a dwelling occupied by petitioners within the meaning of the above regulation. On the record, we find that petitioners operated River Ranch as a business.

Section 167(a)(1) allows a depreciation deduction for property *used* in a trade or business. With the exception of the rather limited and incidental use of the main house by petitioners in conferring with foreman Pyka, as hereinafter mentioned, there is no evidence that the

---

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

three buildings in controversy were used in the ranching business. These buildings were residential-type property and were not used or useful in the operation of the ranch except for conferences with Pyka. To say that this rather large residence with a swimming pool, pool house, and guesthouse were a part of and used in the ranching operation stretches the imagination.

We do not understand petitioners to claim that buildings such as these would normally be used in a ranching business, except possibly as the residence of an owner living on the ranch. Rather, they argue that these buildings were on the River Ranch when they bought it and they had to buy the buildings, along with the ranch, and that they bought the entire ranch as a business and that everything on it not converted to personal use should be considered as being used in the business. The theory of depreciating assets not presently in use can be colloquially termed the "idle-asset rule," and the courts have allowed depreciation deductions for such idle assets as barges, a winery, taxicabs, and barns and sheds on a farm.[2] *P. Dougherty Co.* v. *Commissioner*, 159 F. 2d 269 (C.A. 4, 1946) ; *Kittredge* v. *Commissioner*, 88 F. 2d 632 (C.A. 2, 1937) ; *Yellow Cab Co. of Pittsburgh* v. *Driscoll*, 24 F. Supp. 993 (W.D. Pa. 1938). This rule, however, is not applicable in this case. In each of the above cases the assets involved were of the type normally used in the particular business, they had been acquired for the specific purpose of using them in the business, and for the most part had actually been used in the trade or business. Due to varying circumstances, mostly business conditions, the particular assets had been taken out of service to be held for use in the business at a later date, and had not been actually used in the business during the pertinent years. The above cases held that during those years the bases of the various assets for purposes of computing subsequent depreciation or gain or loss on sale must be reduced for allowable depreciation during those periods. Each of those cases relies primarily on the opinion in *Kittredge* v. *Commissioner*, *supra*, wherein the court, after pointing out that the taxicabs there involved were held by the taxpayer for actual use and would have been used if business conditions had justified the use thereof, said :

Hence we think the phrase [used in the trade or business] should be read as equivalent to "devoted to the trade or business"; that is to say, that property once used in the business remains in such use until it is shown to have been withdrawn from business purposes.

There is no evidence in this case that the three buildings here involved were acquired by petitioners for actual use in the ranching

[2] See also *Otis Beall Kent,* a Memorandum Opinion of this Court dated Dec. 31, 1953 (12 T.C.M. 1491).

business, were devoted to the ranching business, or were ever used or intended to be used in the ranching business by either petitioners or the former owners of the ranch. The most that can be said is that petitioners made some incidental use of the main house in overseeing the ranching operation simply because it was there. This does not justify a deduction for depreciation based on the entire allocated cost of these three structures under the statute.

Petitioners also argue that depreciation on these buildings is also allowable under section 1.167(a)-6(b), Income Tax Regs., which states: "A reasonable allowance for depreciation may be claimed on farm buildings (except a dwelling occupied by the owner), farm machinery and other physical property but not including land." Petitioners contend that none of these three buildings constitutes a dwelling occupied by the owners and, therefore, depreciation deductions should be allowed for these buildings under a literal reading of this regulation. We do not believe such a literal construction of the language of the regulation was intended or should be used. Such would require that a deduction for depreciation would be allowable on all buildings on a farm, except a dwelling occupied by the owners, regardless of the use to which they are put. We think such a broad application of the regulation would go beyond the purview of the statute, which a regulation may not do. *Commissioner* v. *Acker*, 361 U.S. 87 (1959); *United States* v. *Calamaro*, 354 U.S. 351 (1957); *United States* v. *Marett*, 325 F. 2d 28 (C.A. 5, 1963). In *Manhattan Co.* v. *Commissioner*, 297 U.S. 129 (1936), the Supreme Court said:

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity. * * * [Citations omitted.]

However, it is also a well-recognized maxim that in interpreting a regulation the courts should, if possible, avoid a construction which will bring into question the validity of the regulation. *Northern Natural Gas Co.* v. *O'Malley*, 277 F. 2d 128 (C.A. 8, 1960); *Newman* v. *Commissioner*, 76 F. 2d 449 (C.A. 5, 1935).

We think the above regulation can and should be construed and applied in the light of the above principles, and when this is done petitioners can find no support therein. The statute requires that the property be *used* in the trade or business. The regulation, which does not specifically include the language of the statute, nevertheless uses the terms "*farm* buildings" and "*farm* machinery." (Emphasis supplied.) In our opinion this should be construed to mean buildings and machinery used in the business of farming, and we so conclude. Under this

construction the three buildings here involved would not be covered by the regulation, for reasons heretofore stated.

Parenthetically, we add that, considering the main house, the guesthouse, the pool house, and the swimming pool as a compound, and the use to which all of them have been put by petitioners, we think they qualify more as a dwelling of petitioners than as farm buildings. It is true that petitioners have not taken up permanent residence on the River Ranch but they have used this compound frequently for purposes unrelated to the ranch business and have from time to time resided in or dwelt in the compound. On the other hand, there is no evidence that the guesthouse and the pool house were in any way used in the ranch business, except for being on the ranch as a part of the residential compound. They hardly meet the description of "farm buildings."

We would be inclined to allow petitioners a deduction for depreciation on a small part of the main house on the theory that it was used in the business as a ranch office. *International Artists, Ltd.*, 55 T.C. 94 (1970); *United Aniline Co.* v. *Commissioner*, 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court. This would require an allocation of the cost bases of the main house to that portion of the house that could be considered the office, and between that portion of the time that space was used for business and personal purposes, by some formula or another. See discussion in *International Artists, Ltd.*, *supra; George W. Gino*, 60 T.C. 304 (1973). However, the record is devoid of any evidence upon which we could base even a guess on that part of the entire allocated cost of the main house that might be attributed to business use. The records for the ranch were not kept at the ranch but were kept in petitioner's office in San Antonio. There apparently was a desk in the main house but we have no evidence whether it was used for business or where it was in the house. This is not a situation in which the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), can be applied. Petitioners do not argue for an allocation of this sort and consequently have given us no evidence upon which we could reasonably make one. In any event we believe the result would be *de minimis*, and we see no justification for laboring like a mountain to produce a mouse.

We conclude that petitioners may not be allowed a depreciation deduction for the three buildings here involved for the years here involved.

Because of the agreements and concessions of the parties on other issues,

*Decision will be entered under Rule 50.*