ORVILLE W. MEEKER AND HILDEGARDE MEEKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meeker v. Commissioner
Docket No. 136-79.
United States Tax Court
T.C. Memo 1981-215; 1981 Tax Ct. Memo LEXIS 531; 41 T.C.M. (CCH) 1409; T.C.M. (RIA) 81215; April 29, 1981. *531 Held, allocation of farm cost between land and improvements for purposes of depreciation and investment credit determined. Held further, depreciation deductions denied on certain farm improvements not used by petitioners in their trade or business. Russell R. Newell, for the petitioners. Leonard A. Hammes, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1973
$ 3,065.66
1974
106.49
1975
1,227.28
1976
1,308.87
After concessions the issues remaining for decision are: 1. Whether petitioners properly allocated their cost basis in a farm between the land and improvements for purposes of computing depreciation and investment credit. 2. Whether petitioners are entitled to depreciation deductions under section 167[1] with respect to certain farm improvements. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Orville W. Meeker (hereinafter petitioner) and Hildegarde Meeker, husband and wife, resided in Letts, Iowa, *532 when they filed their joint Federal income tax returns for the years 1973, 1974, 1975, and 1976 with the Internal Revenue Service, Kansas City, Missouri, and when they filed their petition in this case. On March 1, 1974, petitioner purchased a 294 acre improved farm in the northwestern part of Louisa County, Iowa. The farm is located in a diversified agricultural area of corn and soybean production with considerable livestock feeding. At the time of the purchase, petitioner owned another farm nearby on which he raised hogs and grain. Prior to March 1974, he also leased 320 acres of farmland on which he engaged in similar activities. Since the lease on the latter property terminated on March 1, 1974, petitioner acquired the subject farm to maintain continuity in his operation. Beginning in 1974, petitioner has grown corn and soybeans on approximately 260 acres of the farm and has raised hogs on part of the remaining acreage. Shortly after his purchase of the farm, petitioner traded a portion of the cropland to a neighboring landowner in exchange for a smaller parcel plus some cash to compensate for the difference in acreage. Following this trade, petitioner's farm consisted of *533 280 acres with a total cost basis of $ 307,000. For the most part, the topography of the farm is gently rolling with the surface drainage generally towards the south and southwest. Except for the farmsteads and the draining ditch, all of the property is considered as tillable. Most of the cropland is classified as Tama Silty Clay Loam with some of the cropland along the western part of the property and the drainageways mapped as Nevin Silty Clay Loam and Judson Silt Loam. All of these soils are very productive. Tama Silty Clay Loam is one of the better and more productive soils in Iowa. Iowa State University estimates the attainable corn yield on Tama Silty Clay Loam, such as found on petitioner's farm, at 127 bushels per acre. As of March 1, 1974, the buildings and other improvements on the farm consisted of the following: (1) Main Dwelling: A two-story frame structure with a full unfinished basement containing a fuel oil furnace. The first floor had a kitchen, dining room, living room, bedroom-office, and entry-stairway area. On the second floor there were four bedrooms and a full bath. The original part of the building was approximately 65 years old and measured 26 feet *534 long by 32 feet wide with a height of 18 feet. There were two additions to the structure, including an enclosed porch, containing 384 square feet. The total living area in the main dwelling was 2,048 square feet. The building had a concrete block/brick foundation with wood siding, aluminum strom windows, and a wood shingle roof. The overall condition of the dwelling was fair to good. Since March 1974, petitioner and his family have resided in the main dwelling. (2) Garage: A frame structure, located approximately 20 feet from the main dwelling, measuring 24 feet long by 26 feet wide with an 8 foot high roof. It had a concrete foundation and floor with an asphalt roof. There were two overhead doors opening to the north. The building was in good condition. During 1974 through 1976, petitioner housed a pick-up truck and an automobile in the garage. (3) Barn: A frame two-story unheated structure, measuring 50 feet long by 36 feet wide, with a 20 foot addition along the west side. The height of the barn was 14 feet. The building was approximately 60 years old and was originally constructed as a horse, cow, and hay barn. In 1974, petitioners used the first floor for farrowing sows and *535 used the second story for hay storage. After 1974, the barn was remodeled and used as a hog facility. The building had an all concrete foundation and floor with a wood shingle roof. It was in fair condition. (4) Poultry House: An older frame structure, containing 640 square feet, with a concrete floor and foundation and wood shingles. It was in fair condition. (5) Two Round Steel Cribs: All steel structures, measuring 18 feet in diameter and 20 feet in height, with concrete foundations and floors. They were originally constructed and used for ear corn storage. Sometime in 1974, petitioners removed the cribs and replaced them with steel bins to store shelled corn. (6) Corn Crib and Hog House: A frame structure, measuring 40 feet long by 34 feet wide with a height of 10 feet. The structure had a concrete foundation and floor and a wood shingle roof. It was in fair to good condition. (7) Machine Shed: A frame structure, measuring 50 feet long by 26 feet wide with a height of approximately 10 feet. It had a concrete foundation and floor with an asphalt roof. The shed was about 20 years old and in good condition. (8) Ear Corn Crib/Granary: A frame structure, measuring 40 feet long by *536 32 feet wide, with a height of 18 feet. It contained storage space for 3,000 bushels of ear corn along each side and for approximately 6,000 bushels of small grain in the overhead bins.Since 1974, the side structures have been converted to hold shelled corn. The building had an inside cup elevator and 14 foot concrete driveway. It was 35 to 40 years old and in fair condition. (9) Upright Stave Silo: A tile structure, measuring 14 feet in diameter and 40 feet in height, wich a concrete foundation. It had no roof and was in fair to poor condition. When petitioner purchased the farm, the structure was full of silage. Petitioner sold the silage in 1974 and did not refill the silo or use it during the years at issue. (10) Steel Storage/Drying Bin: An all steel structure, measuring 21 feet in diameter and 16 feet in height, containing a drying floor, a 5 horsepower L.P. gas dryer, a sweep auger, and an unloading auger. The total grain capacity in the building was 4,400 bushels. The structure was connected to the ear corn crib/granary with overhead augers. It was built in 1966 and was in fair to good condition.
(11) Small Steel Bin: An all steel structure, measuring 12 feet in diameter *537 and 18 feet in height, with a concrete foundation. It was an older structure and was in fair condition. (12) Machine Shed with Attached Loafing Shed: Frame buildings with concrete floors and openings to the east and south. The machine shed had an asphalt roof and contained 1,536 square feet. The loafing shed had a steel roof and contained 512 square feet. Both structures were in fair condition. (13) West Cattle Shed: A frame structure measuring 60 feet long by 24 feet wide with a height of 8 feet.The structure had a concrete floor and wood shingle roof. It was in fair condition. (14) Tenant House: A one-story frame structure measuring 36 feet long by 24 feet wide with a height of 12 feet. There was an enclosed porch along the south side and an open porch along the north side. The house contained a kitchen, dining room, living room, bath, two bedrooms, full basement and an L.P. gas furnace. It had a concrete block foundation and a composition shingle roof.The building was in fair to good condition. When petitioner acquired the farm, his son, David, and his wife moved into the tenant house. During 1974 through 1976 the tenant house was used exclusively by David and his family *538 as a personal residence. David worked full-time in the farm operation during those years, and received a share of farm income. (15) West Machine Shed: An older frame structure, measuring 40 feet long by 20 feet wide with a height of approximately 10 feet. It had a concrete foundation, dirt floor, and composition shingle roof. It was in fair condition. (16) Miscellaneous Sheds: Several small sheds, including an old milk house, a hog shed and a utility shed, used for storage purposes. (17) L.P. Gas Storage Tanks: Two portable 1,000 gallon L.P. gas storage tanks, located at the main dwelling and the tenant house. The L.P. tank at the main dwelling was used to heat the gas dryer in the steel storage/drying bin. The L.P. tank at the tenant house was used to provide gas and heat to that dwelling. (18) Concrete Feeding Floors: There were 155 cubic yards of concrete flooring located on the property. (19) Fencing: Around the entire property were 1,475 rods of interior and exterior fencing in fair to good condition. (20) Field Tile: The surface drainage on the farm was supplemented by an estimated 32,300 rods of subsurface field tile lines (underground drains) nearly all of which emptied *539 into a permanent north-south open ditch line running through the westernmost quarter of the property. Most, if not all, of the farms in Louisa County, Iowa, that had Tama Silty Clay Loam were tiled. Many of the tile lines on petitioner's farm were over 40 years old.
(21) Three Deep Wells: Two wells approximately 100 feet deep provided water for the main dwelling and the livestock. A third well provided water to the tenant house. The highest and best use of the farm at the time it was purchased was as a grain and livestock farm. During late 1973 and early 1974, the sales price per acre of cropland in Louisa County ranged from $ 750 to $ 1,538. The cropland on petitioner's farm had a value of approximately $ 875 per acre. On his joint 1974 Federal income tax return, petitioner allocated his $ 307,000 cost basis in the farm between the land and improvements as follows: Land
$ 183,676
Improvements
123,324
Total Basis
$ 307,000
Petitioner made these allocations by using a "rule of thumb," suggested by his attorney, under which 40 percent of the cost was assigned to the improvements. For the years 1974, 1975, and 1976, petitioner claimed depreciation [2] deductions with respect to such improvements *540 (excluding the main dwelling) in the amounts of $ 4,310, $ 5,155, and $ 5,155, respectively. For 1974, petitioner also claimed that certain improvements [3] acquired in connection with their purchase of the farm constituted qualifying used section 38 property upon which they were entitled to an investment credit. In addition, petitioner claimed a refund of taxes for 1973 resulting from a carryback of unused investment credit in 1974. In his notice of deficiency, respondent determined that petitioner's basis in his farm should be allocated $ 237,452 to the land and $ 69,548 to the improvements. Respondent made these allocations based on the assessed values of the land and improvements for real estate tax purposes as determined by the Louisa County Assessor. Accordingly, respondent allowed depreciation with respect to the farm improvements [4] for 1974, 1975, and 1976 in the amounts of $ 1,976, $ 2,372 and $ 2,372, respectively. [5] Pursuant to the allocations determined in his statutory notice, respondent disallowed a portion of petitioner's claimed investment credit for 1974 and the investment credit *541 carryback to 1973. The following table sets forth the allocation of the cost of the farm as made by petitioner on his returns; as revised by petitioner on brief; as determined by respondent in the statutory notice; as revised by respondent on brief; and as found by the Court: Item
Petitioner's
Petitioner's
Returns
Brief
Main Dwelling $ 25,000 a $ 25,000 a
Tenant House 15,000 b 15,000 b
Garage
c
c
Farm Buildings: Barn
Corn Crib & Hog House
Machine Shed
West Cattle Shed
Machine Shed with 20,000 d 20,000 d
attached Loafing Shed
Poultry House
West Machine Shed
Miscellaneous Sheds
Three Deep Wells: One Deep Well-
Tenant House
e
e
* *543 Two Deep Wells -
Livestock/Main 5,000 2,500
Dwelling
* Concrete Feeding Floors 4,500 4,500
* Upright Stave Silo 2,500 2,000
* Field Tile 25,000 22,802
* Fencing 3,600 3,600
Small Steel Bin 724
f
* Grain Storage & Dryer: Ear Corn Crib/Granary
Two Round Steel Cribs 22,000 g 22,000 g
Steel Storage/Drying Bin
L.P. Gas Storage Tanks: Main Dwelling i i
Tenant House j j
Total Allocation to
Improvements $ 123,324
$ 117,402
Allocation to Land: $ 183,676
$ 189,598
*542 Item
Statutory
Respondent's
Allocation
Notice
Brief
by the Court
Main Dwelling
$ 13,836 $ 23,000
$ 23,000
Tenant House
11,371 10,000
15,000
Garage
2,567 1,250
1,500
Farm Buildings: Barn
3,131 5,000
6,000
Corn Crib & Hog House
3,724 1,000
2,000
Machine Shed
1,756 3,000
4,000
West Cattle Shed
1,194 1,250
2,250
Machine Shed with
attached Loafing Shed
1,956 2,250
3,250
Poultry House
319 500
500
West Machine Shed
1,486 1,000
1,500
Miscellaneous Sheds
510 0
500
Three Deep Wells: One Deep Well-
Tenant House
0
1,000
1,000
* Two Deep Wells -
Livestock/main
596 2,000
2,000
Dwelling
* Concrete Feeding Floors
3,819 1,550
1,550
* Upright Stave Silo
2,161 200
200
* Field Title
4,984 9,708
9,708
* Fencing
4,420 2,100
2,100
Small Steel Bin
715 200
200
* Grain Storage & Dryer: Ear Corn Crib/Granary
8,814 4,500
4,500
Two Round Steel Cribs
2,189 300
300
Steel Storage/Drying Bin
0 h
5,000
5,000
L.P. Gas Storage Tanks: Main Dwelling
0
0
500
Tenant House
0
0
500
Total Allocation to
Improvements
$ 69,548 $ 74,808 $ 87,058
Allocation to Land:
$ 237,452 $ 232,192
$ 219,942 OPINION The first issue for decision is whether petitioner properly allocated his $ 307,000 cost basis in the farm between the land and improvements for purposes of depreciation and investment credit. [6] *544 Section 1.167(a)-5, Income Tax Regs., provides, in part, that where improvements and land are purchased for a lump sum, the basis or cost must be allocated between the depreciable and nondepreciable property in accordance with their relative values at the time of acquisition. On his 1974 return, petitioner allocated $ 123,324 to the improvements and the balance of $ 183,676 to the land. Petitioner testified that he based his allocation on a "rule of thumb," under which 40 percent of the total cost was assigned to the improvements. In his notice of deficiency, respondent reallocated the cost $ 69,548 to the improvements and $ 237,452 to the land based on the values ascribed to such properties for real estate taxes by the Louisa County assessor. [7] At trial, and on brief, both parties modified their respective allocations. Accordingly, petitioner now contends that the total cost of the farm improvements was $ 117,402, whereas, respondent now maintains that such cost was $ 74,808. In support of their allocations, the parties presented expert testimony and appraisal reports with respect to the value of the farm *545 in March 1974. [8]
In determining the value of the land, respondent's expert witness, Robert K. Johnson, analyzed sales of comparable farmland in Louisa County, Iowa, during late 1973 through 1974. This entailed an examination of county property records as well as extensive interviews with the parties involved in those transactions.Based on the sales price per acre of comparable farmland and considering the size, location, and productivity of petitioner's farm, Mr. Johnston concluded that the fair market value of the land was $ 850-$ 875 per acre. [9] *546 Having determined a value for the land, Mr. Johnston appraised each of the farm improvements on the basis of their replacement costs in 1974 discounted by reasonable depreciation and, when appropriate, by obsolescence. Under this approach, he valued the improvements at $ 74,808. By contrast, petitioner's expert, Gary R. Lee, first valued the improvements at $ 191,643, based on new replacement costs, and then determined that the residual land value was $ 115,357 or approximately $ 412 per acre. Although Mr. Lee properly considered replacement costs in valuing the improvements, he totally failed to adjust such costs for physical depreciation. Yet, since the record clearly shows that many of the improvements were old and only in fair condition when purchased by petitioner, it is obvious that the replacement costs utilized by Mr. Lee do not reflect the fair market values in March 1974 of the very properties at issue. See Smith v. Commissioner, 51 T.C. 429, 441 (1968). Consequently, we believe that petitioner's expert grossly exaggerated the value of the improvements and, therefore, necessarily undervalued the land. In fact, the value he assigned to petitioner's productive cropland was over $ 300 per acre less than the lowest selling price per acre of Louisa County farmland during the relevant period. In *547 this connection, we note that Mr. Lee was not an expert real estate appraiser but rather was an insurance manager who had written insurance for petitioner on several occasions. Moreover, as revealed by his testimony, he also acted as the broker in handling petitioner's purchase of the farm and received a commission for his efforts. Finally, we note that petitioner's allocations on his returns and on brief significantly differ from those made by Mr. Lee, and thus we can only conclude that even petitioner has reected the determinations of his own expert. Under these circumstances, we attach little, if any weight to Mr. Lee's appraisal. Upon a careful examination of the entire record, it is our opinion that the appraisal and testimony of respondent's expert constitued the best evidence of the relative values of the land and improvements and, therefore, we approve, in most respects, the revised allocations proposed by respondent. Unlike the arbitrary allocations made by petitioner on his returns, Mr. Johnston's conclusions were based on comparative sales and other relevant valuation criteria. Mr. Johnston was an accredited farm manager and rural appraiser and had extensive experience *548 in valuing Iowa farms. His appraisal report was comprehensive and extremely detailed. Moreover, his testimony was direct, candid, honest, and believable. The only flaw in the appraisal, conceded by Mr. Johnston at trial, was that he mistakenly valued the land, for purposes of allocating the stipulated $ 307,000 cost basis, at its original 294 acres instead of 280 acres.This resulted in his overvaluing the land by $ 12,250. [10] After adjusting for this error, we hold that the basis should be allocated in the manner set forth in our findings of fact. The second issue is whether petitioner is entitled to deductions for depreciation on the garage, the tenant house, the L.P. gas storage tank and deep well associated with the tenant house, and the upright stave silo. Section 167(a)(1) allows a depreciation deduction for property used in the taxpayer's trade or business. Section 1.167(a)-6(b), Income Tax Regs.,provides, in part, that "[a] reasonable allowance for depreciation may be claimed on farm buildings (except a dwelling occupied by the owner), farm machinery, and other physical property but not including *549 land." Although a literal reading of this regulation could arguably support the claimed deductions, this Court has construed such regulation as allowing depreciation only with respect to property used in the business of farming. Steen v. Commissioner, 61 T.C. 298, 304-305 (1973), affd. per curiam 508 F. 2d 268 (5th Cir. 1975). In this case, the record shows that the tenant house was used by petitioner's son, David, and his family as their personal residence and was not used in the farming operation. While it is true that David worked on the farm during 1974 through 1976, this fact does not convert an otherwise personal use structure into depreciable business property. Accordingly, we hold that petitioner is not entitled to depreciation on the tenant house for the years in question. Furthermore, since the L.P. gas tank and deep well provided heat and water to that dwelling, depreciation with respect to those items, must also be disallowed under section 262. [11]
We reach the same result with respect to *550 depreciation on the garage. Although petitioner contends that 90 percent of the garage was used for business purposes, the record is devoid of any credible evidence to support that contention. Accordingly, we must sustain respondent's disallowance of depreciation for the garage. We also sustain respondent's determination with respect to the upright stave silo. The record clearly establishes that the silo was neither placed in service nor used in petitioner's farming business during 1974 through 1976. Moreover, there is no evidence that petitioner ever intended to use the silo in his future farming operations. Accordingly, he is not entitled to the claimed depreciation deductions on the silo. [12]
To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended, and in effect during the years at issue.↩
2. Depreciation was computed on the straight-line method. ↩
3. See Table appearing on page 12.↩
4. Respondent did not allow any depreciation for the garage, tenant house, and deep well associated with the tenant house on the ground that petitioner used those items for personal purposes. Respondent also disallowed depreciation on the upright stave silo because it was never placed in service and was not used during 1974, 1975, and 1976. ↩
5. Petitioner does not dispute respondent's determination of useful lives of the farm improvements for purposes of computing depreciation.↩
*. Petitioner claimed an investment credit with respect to these items. a Includes the main dwelling, 10 percent of the garage, and one deep well. b Includes the tenant house, one deep well associated therewith, and one L.P. gas storage tank. c Petitioner allocated 10 percent of his basis in the garage to the main dwelling and 90 percent to the farm buildings. d Includes the structures listed plus 90 percent of the garage. No allocation was made by petitioner to specific farm buildings. e Included as part of the tenant house. f On brief, petitioner includes this item as part of his total cost of the grain storage and dryer facility. g Includes the items listed plus one L.P. gas storage tank. No allocation was made by petitioner to specific items in the grain storage and dryer facility. h Respondent omitted this item from his notice of deficiency. By amendment to the answer, respondent allocated $ 5,000 to the steel storage/drying bin, and now concedes that petitioner is entitled to depreciation and investment credit with respect to such property. i Included as part of the grain storage and dryer facility. j Included as part of the tenant house.↩
6. Except for the upright stave silo, respondent does not dispute the items upon which petitioner claimed an investment credit.
7. Such valuations have long been recognized by this Court in determining the relative value of land and improvements. 2554-58 Creston Corp. v. Commissioner, 40 T.C. 932, 940↩, n. 5 (1963). 8. The parties are in agreement that the stipulated cost basis of the farm was also the fair market value on such date.↩
9. At trial, Mr. Johnston testified that in arriving at the per acre value of the land, he included the concrete feeding floors, fencing, field tile, and deep wells because those items are normally valued with the land.
10. The 14 acre difference consisted of cropland with a value of $ 875 per acre.↩
11. Sec. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩
12. Since petitioner did not use the silo in his trade or business, it was not section 38 property and, therefore, no investment credit is allowable with respect to that item. See sections 48(a)(1) and 167(a).↩