JAMES MICHAEL KINERD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kinerd v. Commissioner
Docket No. 7270-79.
United States Tax Court
T.C. Memo 1982-398; 1982 Tax Ct. Memo LEXIS 341; 44 T.C.M. (CCH) 475; T.C.M. (RIA) 82398; July 19, 1982. *341 Respondent determined that petitioner under-reported income by $18,590.74 for 1975 and by $40,799.49 for 1976. Additionally, respondent disallowed certain claimed depreciation deductions taken on an automobile and two airplanes and investment tax credit taken on one airplane. Held, petitioner's testimony with respect to purported loans from his father during 1975 and 1976 is credible. Accordingly, the discrepancies revealed by respondent's bank deposits and cash expenditures method are in part attributable to these loans. Held further, depreciation deductions and investment tax credit to which petitioner is entitled determined. Held further, petitioner is liable for the addition to tax pursuant to section 6653(a), I.R.C. 1954. James Michael Kinerd, pro se. Gary A. Benford, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated March 28, 1979 respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Taxable year
Addition to tax under
ended Dec. 31,
Deficiency
sec. 6653(a)
1975
$6,083.32
$304.16
1976
12,717.95
635.90
The issues for decision are: (1) whether petitioner understated his taxable *342 income in the amounts determined by respondent for the taxable years 1975 and 1976, (2) whether petitioner is entitled to an investment tax credit and a depreciation deduction claimed in 1975 on an airplane and whether he is entitled to depreciation deductions taken on an automobile and on two airplanes in 1976; and (3) whether petitioner is liable for additions to tax pursuant to section 6653(a), I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner James Michael Kinerd resided in Sweetwater, Texas at the time of filing the petition herein. Petitioner and his wife filed joint Federal income tax returns for the taxable years 1975 and 1976 with the Office of the Director, Internal Revenue Service. [1]
Throughout 1975 and 1976 petitioner operated a Texaco service station in Sweetwater, Texas from which he sold petroleum products, repaired automobiles, conducted a wrecker service and rented trailers. Additionally, *343 petitioner leased a Texaco service station in Roscoe, Texas during 1975 and 1976. During 1975 the Roscoe service station was operated as a partnership, from which petitioner received a net gain of $6,331.69. Petitioner also operated a bail bond business and owned an interest in a janitorial supply business during the years at issue. During 1975 and 1976 petitioner maintained a bank account in the name of the Sweetwater Texaco station at the First National Bank of Sweetwater, Texas. During these 2 years, deposits were made by petitioner into this account totaling $70,565.49 in 1975 and $52,927.53 in 1976. Petitioner also maintained a personal bank account at the First National Bank of Sweetwater, Texas in his own name. He made deposits into this account totaling $40,530 in 1975 and $40,877.03 in 1976. A third bank account was maintained by petitioner during 1976 in the name of the Roscoe Texaco station at the Roscoe State Bank, Roscoe, Texas. During that year deposits were made into this account in the total amount of $69,567.04. During 1976 petitioner also maintained a savings account at the First National Bank of Sweetwater, Texas into which he deposited a total of $12,500 *344 during the year. Throughout 1975 and 1976 petitioner allowed customers to charge their purchases provided they had an acceptable credit card. Petitioner used these charge slips to purchase gasoline and make other payments to Texaco. The charge slips used in this fashion were included in cash expenditures by respondent in his statutory notice of deficiency. The total cash expenditures as calculated by respondent were $299,087.05 in 1975 and $382,542.67 in 1976. Also during 1976 petitioner made note payments in cash in the amount of $8,554.43. Petitioner reported income (other than wages, dividends and interest) of $14,827.97 in 1975 and of $7,924.33 in 1976. Petitioner reported income from his bail bond business of $2,605.35 for 1975 and $8,114 for 1976. He also reported interest income in the amount of $1,200.18 for 1975 and $1,577.50 for 1976. In addition, during the years in question, petitioner had an interest in a gas well and received money from a wrecker service. In 1975 and 1976 petitioner purchased a Chevolet El Camino pickup truck for $6,600, a Chevrolet Corvette automobile for $9,950, an airplane for $15,000, and an airplane for $8,375. He also added a new den to *345 his home at a cost of $10,000. According to respondent's worksheet and to testimony presented at trial, respondent calculated that petitioner underreported his taxable income for 1975 in an amount totaling $18,590.74 [2] *346 and for 1976 in an amount totaling $40,799.49. [3] *347 Respondent's curiosity in this case initially was aroused by what he considered to be too extravagant a lifestyle for a gas station owner. During audit it was discovered that petitioner had made a large number of deposits during the 1975 and 1976 *348 taxable years. The source of these deposits was unexplained. Respondent conjectured that petitioner had received income from his various business ventures that had not been reported. During audit on May 5, 1977 petitioner told Revenue Agent Bedford that he had borrowed $7,000 from his father during 1975 and 1976. On July 13, 1977 petitioner allegedly told Revenue Agent Bedford that he had borrowed $20,000 from his father in 1972 or 1973 and had used this money to purchase certificates of deposit. At trial both petitioner and his father denied the existence of a $20,000 "loan" in 1972 or 1973. Petitioner testified that during the 2 years in question he borrowed a total of $37,500 from his father. The purported loans were made in cash payments, the largest of which was $7,000 and the smallest of which was $1,500. According to petitioner and his father, the loans were made periodically throughout the 2 years in question. On June 12, 1978 petitioner's father told Revenue Agent Bedford that the "loans" to petitioner had been in cash and that he had gone to his safe deposit box to get the money for the loans. At trial petitioner's father testified that the most money he ever had *349 at one time was about $40,000, all of which he had saved over a long period of years.He stated that he kept about $30,000 of this in the safe deposit box at his bank and the remainder hidden in his home.Also on June 12, 1978 petitioner's father contacted Agent Bedford and told him the exact months he had loaned petitioner money in 1975 and 1976. At trial petitioner's father introduced two calendars that allegedly were used to record the loans made to petitioner. The information elicited at trial is inconsistent with the information provided to Agent Bedford on June 12, 1979. [4] *350 On his 1975 return petitioner claimed an investment credit of $1,000 and depreciation of $625 related to the purchase of an airplane on July 1, 1975. In computing the depreciation deduction for that year petitioner treated the airplane as being used for business 50 percent of the time. This percentage was not determined by reference to a flight log but was selected by petitioner's tax return preparer "to stay on the safe side." No specific information was provided to the tax return preparer or to this Court concerning the number of days or hours the airplane purchased in 1975 was used for *351 business.However, petitioner stated at trial that the airplane was used in his bail bond business to pick up bail jumpers and that his use of the airplane was completely for business purposes. [5]
On his 1976 return petitioner claimed depreciation in the amounts of $2,250, $625 and $628.10 related to an automobile and to two airplanes. The automobile was a 1976 Chevrolet Corvette purchased on August 4, 1976. This car was depreciated as being used 100 percent for business. Petitioner made no allocation between business mileage and personal mileage. The airplanes were both depreciated as being used 50 percent for business. [6]
In his notice of deficiency respondent determined that petitioner had understated his income for the 1975 taxable year by $18,590.74 and for the 1976 taxable year by $40,799.49. Additionally, *352 respondent denied petitioner's claimed investment tax credit and depreciation for the airplane purchased in 1975 and denied petitioner's claimed depreciation on the Corvette automobile taken in 1976 and on the two airplanes taken in that year. OPINION Realistically the first issue we must decide is one of credibility. Respondent utilizes the bank deposits plus cash expenditures method to support his determination that petitioner had income in the taxable years 1975 and 1976 that he failed to report.Petitioner counters that his books and records accurately reflect the income he received for the years in question. He accounts for the unexplained bank deposits with the assertion that they stemmed from a number of loans made to him by his father during 1975 and 1976. The total amount of such loans was alleged to be $37,500. Respondent's determination of deficiency is presumed correct and petitioner has the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Marcello v. Commissioner,380 F.2d 509 (5th Cir. 1967), affg. a Memorandum Opinion of this Court. [7] It is settled that a deficiency determination properly based on unexplained bank deposits is entitled to the *353 presumption of correctness. Armes v. Commisisoner,448 F.2d 972 (5th Cir. 1971), revg. on other issues a Memorandum Opinion of this Court; [8]Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). The bank deposits plus cash expenditures method is a method for establishing the existence of unreported income. See Marcello v. Commissioner,380 F.2d 509, 511 (5th Cir. 1967), affg. a Memorandum Opinion of this Court. [9] Contrary to petitioner's contention, the internal consistency of a taxpayer's books and records does not establish their accuracy. See Holland v. United States,348 U.S. 121, 132 (1954); Foster v. Commissioner,487 F.2d 902, 903 (6th Cir. 1973), affg. a Memorandum Opinion of this Court. [10]
Respondent suggests a number of potential sources of the alleged unreported income. These include petitioner's service stations, his bail bond business and his janitorial service. Additionall, respondent suggests that petitioner may have received the alleged unreported income from his interest in a gas well, from a wrecker service associated with his gas *354 stations, and from the purchase and resale of automobiles and trucks. Respondent alleges that petitioner's modest income as reported on his tax returns for the years in question could not have supported his extravagant spending, which included the purchase of an El Camino pickup truck for $6,600, a Chevrolet Corvette automobile for $9,950, an airplane for $15,000, and an airplane for $8,375. Additionally, petitioner added a new den to his home at a cost of $10,000. [11] *355 Respondent has mounted an impressive assault against petitioner's contention that some of the unexplained bank deposits were derived from monies loaned to him by his father. He points to inconsistencies in petitioner's and his father's testimony. Respondent further points to the disparities between (1) petitioner's father's visits to his safe deposit box from 1974 through the end of 1976, (2) the timing and amounts of loans made according to a conversation with petitioner's father that took place on June 12, 1978, (3) the timing and amounts of loans according to calendars submitted by petitioner at trial, and (4) cash deposits made by petitioner during the years in question. Respondent asserts that the large number of inconsistencies in petitioner's statements *356 with respect to the loans totally undermines the credibility of both petitioner and his father and suggests that the most that petitioner's father loaned his son during the years in question was $7,000. We fully acknowledge and appreciate the inconsistencies to which respondent has drawn our attention. In another case at another time, such evidence would certainly more than carry the day. However, in this case we are confronted with a very difficult decision, for we found both petitioner and his father to be, albeit somewhat confused, entirely credible and trustworthy with respect to the existence of periodic loans during 1975 and 1976. Petitioner's sincerity was most evident at the end of trial when he delivered a spontaneous declamation negating the thrust of respondent's assertions. This controversy has been long and bitter and has centered, to respondent's benefit, upon a family situation that deteriorated to the point of hostility.We agree with petitioner, as he stated at trial, that "we haven't even skimmed the surface of [this case] because we're talking about peoples lives and we're talking about feelings, and we're talking about family when we talk about this money." Petitioner *357 did not appear as a complex individual. He evidenced little sophistication both with respect to tax matters generally and to the true nature of the specific dispute herein. This, of course, works to his disadvantage. He was not prepared to confront the multitude of assertions made by respondent (in total good faith, we might add) at trial and, like many pro se taxpayers, had no concept or appreciation of the burden of proof he faced herein. Petitioner showed little understanding of respondent's admittedly complex derivation of his income by means of the bank deposits and cash expenditures method, and we believe petitioner when he says that he was unable to afford to pay a lawyer well versed in such arcanum. We have found this to be an extremely close case and we have no assurance that we can divine the correct result. We have carefully considered the evidence and the reliability and trustworthiness of petitioner and his father.All in all, petitioner's evidentiary presentation and attempted point-by-point refutation of respondent's assertion were lacking; however, his sincerity and credibility in this effort were not. We believe petitioner and his father in their representations *358 that periodic loans were made throughout the years in question, although their vagueness and confusion with respect to the timing and amounts of these loans must weigh against them. Thus, we hold that the discrepancies revealed by respondent's bank deposits and cash expenditures method are in part attributable to loans made by petitioner's father to ppetitioner in the amount of $8,000 in 1975 and $15,000 in 1976. In so holding, we apply principles analogous to those expounded in Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). See Llorente v. Commissioner,74 T.C. 260, 268 (1980), affd. in part and revd. in part on other grounds, 649 F.2d 152 (2d Cir. 1981). Petitioner asserted that the remainder of the unreported income determined by respondent was attributable to savings from prior years, the sale of a piece of property in 1973 for $8,530, monies received from his bail bond business that he reported as income in later years, and additional transfers from one bank account to another. We accept the testimony with respect to the receipt of $8,530. With respect to the monies received from petitioner's bail bond business that he reported in income in later years, such amounts should *359 have been reported during the years of receipt, and petitioner's only recourse with respect to these amounts is to amend his returns for the later years (if these years remain open under the statutue of limitations), reducing income by the amounts wrongfully reported in those years. With respect to the other allegations, we find that petitioner's proof was not specific enough to enable us to make a finding in his favor. The assertions with respect to the sources of deposits, with the exception of the loans from his father and the $8,530 from the sale of property, were entirely too vague and disorganized to enable petitioner to carry his burden of proof with respect to these items. Welch v. Helvering,290 U.S. 111 (1933). [12] Thus, respondent's application of the bank deposits plus cash expenditures method is sustained to the extent the amounts determined to have been underreported exceed $16,530 in 1975 and $15,000 in 1976. [13] *360 On July 1, 1975 petitioner purchased an airplane. On his return for that year he claimed investment tax credit of $1,000 and depreciation of $625 on the plane. In computing the depreciation deduction petitioner treated the plan as being used for business 50 percent of the time. No flight log recording the business versus personal use of the plane was submitted to the Court. Petitioner stated that he used the plane exclusively in his bail bond business but that his tax return preparer conservatively chose a 50-percent figure for the sake of safety. On August 4, 1976 petitioner purchased a 1976 Chevrolet Corvette that was depreciated on his return as if it had been purchased on January 1, 1976 and used entirely for business. No records were kept with respect to the business versus personal mileage of the car. Also, on his 1976 return the two airplanes owned by petitioner were depreciated as if used 50 percent of the time for business purposes. Section 162 provides for a deduction for all ordinary and necessary expenses paid or incurred during *361 the taxable year in the carrying on of a trade or business. Section 167 provides that there shall be a deduction for the exhaustion, wear and tear of property used in a trade or business or property held for the production of income. If property is used in part for business purposes and in part for personal purposes, depreciation is deductible only to the extent of the business use. Steen v. Commissioner,508 F.2d 268, 270 (5th Cir. 1975), affg. 61 T.C. 298 (1973). Petitioner testified that he used his airplanes exclusively for his bail bond business but that he claimed depreciation as if the planes had been used only 50 percent of the time for business purposes. Unlike respondent, we do not believe that petitioner's tax return preparer's conservative stance should be used as an excuse for completely undermining petitioner's claim for a deduction. Petitioner stated that he used the plane on four separate occasions to make long-distance trips in connection with his bail bond business. We believe this testimony to be credible. However, petitioner's failure to introduce into evidence a flight log or any other documentary evidence works against him. We believe that some business *362 use was made of both airplanes during the 2 years in question. However, because petitioner has failed to submit specific evidence of his business usage of the airplanes, we must limit his depreciation deductions to 25 percent for the years in question. Cohan v. Commissioner,supra.Additionally, as respondent contends, petitioner must recapture in 1976 that portion of the investment tax credit properly taken in 1975. Sec. 47(a). With respect to the Corvette automobile purchased on August 4, 1976, respondent is correct in his assertion that depreciation only can be taken from the date of purchase until the end of the taxable year and not as if the automobile had been purchased on January 1 of the taxable year. See sec. 1.167(a)-10(b), Income Tax Regs. Because petitioner failed to memorialize his business usage of the car as distinguished from his personal usage, we must deny the bulk of his claimed depreciation deduction for the remainder of the year. However, we do believe that the car was used by petitioner in his various businesses and therefore allow him depreciation as if the car were used 15 percent for business. Cohan v. Commissioner,supra.[14] *363 Petitioner failed to present evidence contravening respondent's determination of an addition to tax pursuant to section 6653(a), and therefore we sustain respondent on this issue. *364 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Although the tax returns for the years in question were joint income tax returns, petitioner filed the petition herein in his name only.↩
2. This was calculated as follows: respondent added the amounts deposited during the year into the Sweetwater Texaco account and into the personal account of Mr. Kinerd to reach a total of $111,495.49 in total deposits. From this he subtracted the proceeds from a loan obtained by Mr. Kinerd during the year in the amount of $18,250, a transfer from the American Janitorial account of $5,000, a transfer from the Roscoe Texaco account in the amount of $2,000, and the proceeds from the sale of Mr. Kinerd's Corvette in the amount of $6,850, leaving gross income deposited in an amount of $79,395.49. Added to this figure were the total cash expenditures for 1975 of $299,087.05 and the partnership income earned by Mr. Kinerd from the Roscoe Texaco station of $6,331.69 to obtain gross income totaling $383,284.23. This total should have been $384,814.23. From this respondent subtracted cost of goods sold totaling $299,040.81, operating expenses of $50,182.02, and payment to an individual retirement account of $1,500 to reach a total adjusted gross income figure of $32,561.40. This total should have been $34,091.40. From this amount respondent subtracted itemized deductions totaling $2,981.53 and exemptions totaling $3,750 to reach a total taxable income figure of $25,829.87. This should have been $27,359.87. Since petitioner reported income for 1975 of only $7,239.13, respondent determined that such income had been underreported by $18,590.74. This should have been $20,120.74. Respondent also overstated total deposits by $400. Thus, the proper total for underreported income should have been $19,720.74 for 1975. 3. This was calculated as follows: respondent added the amounts deposited during the year into the SweetwaterTexaco account, the Roscoe Texaco account, and the personal account of Mr. Kinerd to reach a total of $163,401.60 in total deposits (this included a "correction deposit" of $30.00). From this he subtracted the proceeds from a loan obtained during the year in the amount of $7,000, a transfer from the RoscoeTexaco account in the amount of $2,000, and a transfer from Mr. Kinerd's savings account in the amount of $7,000, leaving gross income deposited in the amount of $147,401.60. Added to this figure were total cash expenditures for 1976 of $382,542.67 to obtain gross income totaling $529,944.27. From this respondent subtracted cost of goods sold totaling $430,433.29 and operating expenses of $71,772.19. To this respondent added note payments made in cash in the amount of $8,554.43 and deposits made into Mr. Kinerd's savings account in the amount of $12,500, and subtracted a $1,500 payment to an individual retirement account. Taxable long term capital gain of $488.94 was added to give a total of $47,782.16 in adjusted gross income. From this amount respondent subtracted itemized deductions totaling $3,393.05 and exemptions totaling $3,750 to reach a total taxable income figure of $40,639.11. Since petitioner reported taxable income of minus $160.38, respondent determined that such income had been underreported by $40,799.49.
4. Respondent attempted to obtain the testimony of petitioner's mother at trial by issuing a subpoena. Revenue Agent Whitehorn attempted to serve the subpoena on petitioner's mother on four separate occasions. On one of these occasions he was accompanied by a deputy sheriff. On each occasion Revenue Agent Whitehorn knocked on the residence door of petitioner's father and mother and petitioner's father answered the door. Each time petitioner's father stated that his wife was not at home and he did not know where she was. In truth petitioner's mother was at home on each occasion and petitioner's father was aware of this. However, petitioner's father stated that his wife was in very poor health, beset by diabetes, and that he was attempting to protect her health by refusing entrance to the Revenue Agent. A letter was entered into evidence from a doctor which indicated that petitioner's mother was in such poor health that her attendance at the trial would endanger her. It was clear from the testimony of both petitioner and his father that the relations between petitioner and his mother had become very strained since the years at issue and that they had not spoken to each other for a period of time.
5. Petitioner learned to fly the airplane in the year of purchase, 1975. He sold the airplane in 1976 but did not recapture the investment credit claimed on his 1975 return.↩
6. Additionally, petitioner took depreciation on a pickup truck he purchased on July 1, 1976, claiming that it was used 100 percent for business.Respondent did not deny the depreciation deduction on the truck.↩
7. T.C. Memo. 1964-304↩. 8. T.C. Memo. 1969-181↩.
9. T.C. Memo. 1969-304↩. 10. T.C. Memo. 1972-188↩.
11. Respondent also asserts that petitioner purchased three motorcycles, a van, new furniture, custom draperies and carpet for his 4-bedroom home, and several expensive pieces of jewelry. He also asserts that petitioner and his former spouse took flying lessons, piano lessons, Dale Carnegie lessons, bowling lessons, tennis lessons, and trips to Hawaii, Las Vegas, Acapulco and other places in Mexico. Finally, respondent alleges that petitioner purchased for his in-laws a new pickup truck, a 19-foot trailer and a diamond ring. Respondent's sole source of information for these expenditures was petitioner's mother, who was too ill to attend trial. Besides any hearsay problems that may be attendant to petitioner's mother's statements to Revenue Agent Bedford, we believe that the information imparted to him by petitioner's mother is inherently unreliable due to the extremely strained relations between petitioner and his mother at the time the statements were made. The statements themselves indicate a measure of hyperbole, which in addition to the other undermining factors, support our conclusion that they are entitled to be given no weight.
12. We note that such finding has no bearing upon petitioner's credibility; petitioner simply has failed to carry his burden. ↩
13. The proper application of the bank deposits plus cash expenditures method is not affected by the fact that respondent erred in part with respect to what constituted income. Marcello v. Commissioner,380 F.2d 509, 511↩ (5th Cir. 1967), affg. a Memorandum Opinion of this Court.
14. We do not believe that the claimed deductions and petitioner's statements at trial with respect to his business usage of the planes and automobile necessarily reflect adversely upon his credibility. Petitioner did not prepare his own returns for the years in question but turned his records over to a tax return preparer for such years. The depreciation claimed upon the automobile prior to its purchase presumably was taken according to computations made by petitioner's tax return preparer. The depreciation of the automobile as if used completely for business purposes probably results from petitioner's failure to comprehend tax law. The car was purchased in the name of his service station. We have found that it was used in his business. Petitioner may have concluded that all mileage accrued on an automobile purchased by his business was business mileage, not knowing that commuting expenses and minimal personal use cannot provide a basis for deduction. In any event, in our considered opinion, petitioner's credibility remains intact.