RICHARD P. MEAGHER AND JANE P. MEAGHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meagher v. Commissioner
Docket No. 35700-83.
United States Tax Court
T.C. Memo 1986-116; 1986 Tax Ct. Memo LEXIS 493; 51 T.C.M. (CCH) 676; T.C.M. (RIA) 86116; March 24, 1986
Charles B. Swartwood and Francis J. Russell, for the petitioners. Ellen Pilsecker, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to Special Trial Judge Daniel J. Dinan pursuant to the provisions *495 of section 7456(c) of the Internal Revenue Code[1] and Rules 180, 181 and 183, Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1976
$3,643.00
1977
7,890.88
1978
11,494.00
1979
20,867.00
1980
43,317.00
The issues for decision are: (1) Whether petitioners' hours operations constituted "an activity not engaged in for profit" within the meaning of section 183; and (2) if petitioners' operations are found to have been an activity engaged in for profit, whether petitioners are entitled to business and depreciation expense deductions and investment tax credits in excess of the amounts allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and stipulated exhibits are *496 incorporated herein by this reference. Petitioners Richard P. Meagher (Mr. Meagher) and Jane P. Meagher (Mrs. Meagher), resided in West Boylston, Massachusetts, at the time they filed their petition in this case. They filed joint Federal income tax returns for the taxable years 1976, 1977, 1978, 1979 and 1980 with the Internal Revenue Service Center in Andover, Massachusetts. Mr. Meagher has been a practicing accountant since 1949 and has been a certified public accountant since 1954. Net income from his practice for the years 1976 through 1980, inclusive, was: Years
Incomes
1976
$56,911
1977
56,720
1978
90,969
1979
61,551
1980
112,458
Petitioners had no substantial income other than the income from Mr. Meagher's accounting practice. During the years 1950 to 1970, however, Mr. Meagher invested in four real estate ventures and realized a loss on only one of the investments. Petitioners have two children--a son, Kevin, who was born on November 30, 1954, and a daughter, Karen, born on April 23, 1957. Petitioners' first involvement with horses began in 1963 when their daughter, Karen, started riding lessons at a stable in Shrewsbury, Massachusetts. *497 They originally leased horses for their daughter to ride. However, during the period 1965 through 1970, petitioners purchased various horses which were boarded and trained at stables in Shrewsbury and Southborough, Massachusetts and shown by their daughter at various horse shows. During the period 1967 throughout 1971, Mr. Meagher explored the possibilities of buying and selling show horses for profit with the owners and operators of the riding stables where their daughter's horse was boarded. Petitioners did not, however, purchase any horses for profit during this period. In 1971 petitioners began boarding their daughter's horse at Saddle River Stables in Sterling, Massachusetts, which was owned and operated by Mr. and Mrs. Henry Hulick and managed by Mitchell and Kathryn Steege. The Hulicks had been in the horse business for more than 30 years. The Steeges, who also had been involved in the horse business a number of years, were accomplished instructions and professional riders of show horses. During the period 1971 through 1972, petitioners discussed with the Hulicks and other people in the horse business the profit potential of investing in a show horse, having it professionally *498 trained and thereafter sold. On the advice of Mrs. Hulick, petitioners purchased their first investment horse, Tustin, in 1973 for $8,700. During the period 1973 through 1977, petitioners purchased two other investment horses, Easy Rider and Tammany, for $10,333. All of these horses were purchased on the advice of Mrs. Hulick, who received a commission on each sale. These horses were boarded and trained at the Saddle River Stables and were shown at numerous horse shows by professional riders. Neither petitioners nor their danghter, Karen, rode the horses at shows. Petitioners, however, did attend some of the horse shows where their horses were entered and at such shows sought the advice of other persons who appeared to be making money in the horse business. Tustin was not a successful horse so petitioners sold it in 1976 for $7,400 and reported the gain on the sale, in the amount of $1,745, on their 1976 income tax return. Petitioners were concerned with the large amount of expenses they were incurring at the Saddle River Stables. Therefore, in 1977 they moved their horse Tammany to Applewood Farm in Connecticut to be trained and shown by Clifford Gustafson. The cost of *499 maintaining Tammany at Applewood Farm was substantially less than the cost incurred at Saddle River Stables. In 1977 petitioners purchased a horse named Breakaway for $7,000 on the advice of Clifford Gustafson and Mitchell Steege. Breakaway was successfully shown at various horse shows by Clifford Gustafson, Mitchell Steege and Karen Meagher but due to an ailment had to be put down [killed] in 1981. During 1977, on the advice of the Steeges, petitioners decided that if they were to be successful in the horse business they would have to own a facility where they could expand their operation. In the latter part of 1977 petitioners and the Steeges agreed to enter into a joint venture for the purchase and operation of a horse training and lesson facility. Petitioners and the Steeges investigated numerous properties throughout Massachusetts, Connecticut, New York, New Hampshire and Rhode Island for such a facility. During 1977 and 1978, petitioners and the Steeges entered into serious negotiations for the purchase of farms in Simsbury, Connecticut, Easton, Massachusetts, and Norton, Massachusetts. In connection with their consideration of these properties Mr. Meagher and Mrs. *500 Steege prepared income and cash-flow projections to determine the feasibility of the successful operation of each facility. While their projections indicated that these facilities would be profitable ventures, petitioners were unable to purchase any of these properties. In the fall of 1978, petitioners and the Steeges investigated the possibility of purchasing a facility in West Barnstable, Massachusetts, now known as Race Lane Farm. Petitioners and the Steeges prepared income projections for Race Lane Farm for a two-year period which indicated that the facility could be operated at a profit. In December of 1978 petitioners entered into a purchase and sale agreement for the purchase of the West Barnstable property for $247,500. The Steeges did not participate in the purchase or operation of Race Lane Farm since they were satisfied with their own horse operation and they questioned whether the business could be operated correctly in the location. As a condition of the sale, petitioners obtained a zoning variance from the town of Barnstable which would permit them to operate a business on the premises. In June, 1979, petitioners acquired title to the property which consisted *501 of 13.5 acres of land including a two bedroom house, a barn, and an indoor riding arena. Petitioners were unable to begin active operation of Race Lane Farm until September of 1979 since the grounds were in poor condition, the arena and barn required improvements, and Mr. Meagher had suffered a heart attack in January 1979. The house at Race Lane Farm was furnished with items brought from petitioners' home in West Boylston and several other furnishings and carpets purchased by petitioners. Petitioners added several improvements to the barn and arena. They built six more stalls in the barn which originally contained ten box stalls on the first floor and six box stalls on the second floor. The arena, which was built in 1974, is a metal building used for riding, training and showing horses. During 1979, petitioners installed indoor arena lights for night lessons and horse shows. Most of the labor for these and other improvements was supplied by petitioners and their daughter Karen. Once petitioners completed the building improvements and ground maintenance, they began operations which included providing riding lessons, training and boarding horses owned by petitioners and others, *502 and running horse shows. In 1979 petitioners sold Tammany for $6,300 and reported a loss in the amount of $153 on their 1979 income tax return. They also purchased two show horses for eventual resale, Applewood Imp for $800 and Baby for $1,100. Applewood Imp was trained by Karen Meagher and was successfully shown by professional riders. The insured value of Applewood Imp based upon its show accomplishments and a veterinarian's examination was $35,000. During 1979 and 1980 petitioners also purchased five inexpensive school horses which were used for riding lessons. Karen Meagher, who is licensed to give horse back riding lessons in the state of Massachusetts, has lived and worked on Race Lane Farm from the time petitioners purchased the property until the time of trial. During this time she was employed by her parents, petitioners, to manage the horse operation and as a condition of her employment she was required to reside at the farm. Petitioners provided Karen Meagher with room and board and paid her a salary of $75 per week from July of 1979 until October 10, 1980 and $100 per week from October 10, 1980 through the end of 1980. Prior to petitioners' purchase of Race Lane *503 Farm, Mrs. Meagher was not employed outside the home. She moved to Race Lane Farm during the summer of 1979 and lived and worked there until November 1981. Mrs. Meagher's duties at Race Lane Farm included acting as a ground coach for Karen while she was training a horse, outside maintenance, driving children to and from lessons, overseeing children at lessons or horse shows, mucking stalls, secretarial work at horse shows, and helping to handle horses. Her average workday during 1979 and 1980 extended from 9:00 in the morning until dark. Richard Meagher resided in West Boylston, Massachusetts, during the years at issue. However, he traveled to Race Lane Farm every weekend and, when required, during the week. Mr. Meagher's duties included maintenance work, keeping the financial records and the overall financial management of the enterprise. Petitioners' son Kevin did not reside at Race Lane Farm. However, he was generally there during horse shows and for holidays. During 1979 and 1980, petitioners employed at least four individuals other than Karen Meagher to work at Race Lane Farm. These employees were paid by check and the required federal and state taxes were withheld from *504 their wages. Petitioners did not socialize or entertain guests at Race Lane Farm and they did not join area social clubs or frequent the area beaches. Holidays were spent at Race Lane Farm because the other hired help did not work on holidays. During 1979 and 1980, petitioners advertised their horse business in local newspapers, New England horse publications and a leading national horse business publication. During the winter petitioners conducted a horse show at Race Lane Farm about every six weeks. During the summer shows were held less frequently. Prior to the purchase of Race Lane Farm in June of 1979, petitioners maintained no separate checking account for their horse operation. However, petitioners did prepare periodic summaries of horse expenses during the year and year-end summaries for preparation of petitioners' tax returns. After the purchase of Race Lane Farm, petitioners opened a separate bank account for their horse activity and maintained detailed monthly business records similar to those maintained by Mr. Meagher in his accounting practice. On their Federal income tax returns for 1973 through 1980, petitioners reported losses from their horse activities *505 in the following amounts: Year
Loss Claimed
1973
$9,318
1974
20,060
1975
9,992
1976
7,162
1977
18,987
1978
21,604
1979
56,848
1980
95,837
In reporting income, expense, and credits in respect of their horse activity, petitioners claimed deductions for automobile expense, food expense, and depreciation. They also claimed investment tax credits. In his notice of deficiency, respondent substantially disallowed these deductions and credits on the ground that they were not allowable even if petitioners' horse operation was an activity engaged in for profit. Since petitioners have been unable to generate a profit from their horse activities and the claimed losses represent substantial out-of-pocket expenses, petitioners are attempting to sell Race Lane Farm and have listed it for sale with a real estate broker at a price of $695,000. OPINION I Section 183(a) generally provides that if an individual's activity is not engaged in for profit, "no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(a). Section 183(c) defines an activity not engaged in for profit as "any activity *506 other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The standard for determining whether the expenses of an activity are deductible under either section 162 or section 212(1) or (2) is whether the taxpayer engaged in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. in an unpublished opinion, 702 F.2d 1205 (D.C. Cir. 1983); Allen v. Commissioner,72 T.C. 28 (1979). The taxpayer's expectation of profit need not be reasonable but he must establish that he entered into the activity or continued the activity with a bona fide intention and good faith objective of making a profit. Section 1.183-2(a), Income Tax Rags.; Allen v. Commissioner,supra, at 33. Whether petitioners had the requisite profit objective is a question of fact to be determined from all the facts and circumstances. The regulations contain a list of relevant factors for consideration in determining whether an activity is engaged in for profit. These relevant factors are: (1) *507 the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on this activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. No one factor is determinative, nor is the determination based upon whether the listed factors indicating a lack of profit exceeds the number indicating a profit objective or vice versa. Appley v. Commissioner,T.C. Memo. 1979-433. The determination is to be based on all the facts and circumstances. Engdahl v. Commissioner,72 T.C. 659 (1979). It is clear that raising, training and showing horses for sale may constitute a trade or business. Commissioner v. Widener,33 F.2d 833 (3rd. Cir. 1929), *508 affg. 8 B.T.A. 651 (1927). We believe that petitioners had a bona fide intention and good faith objective of earning a profit from their horse training and showing activities and their Race Lane Farm operations. Our conclusion is based upon the record as a whole and we have based many of our findings largely upon the uncontradicted testimony of petitioners and their daughter, Karen. We found them to be both candid and credible witnesses. An analysis of the relevant factors as applied to petitioners' horse operations is as follows: Factor (1): The Manner in Which the Taxpayer Carries on the Activity. Petitioners carried on their horse activities in a businesslike manner. During the period 1973 through May, 1979, petitioners used their personal checking account for their horse operations. However, Mr. Meagher prepared year-end summary ledgers and retained all invoices and bills relating to the horse activity. See Engdahl v. Commissioner,supra at 667. When petitioners purchased Race Lane Farm, they established a bank account separate from their personal accounts, and maintained a ledger solely for their horse operation. They also maintained *509 detailed employee payroll records and withheld income taxes and social security taxes from the wages paid to their employees. Petitioners advertised their operation in horse publications, local newspapers and by exhibiting their horses at shows. See Bishop v. Commissioner,T.C. Memo. 1972-167; Pennington v. Commissioner,T.C. Memo. 1967-111. In an effort to reduce expenses, petitioners moved their horses from the Saddle River Stables located in Sterling, Massachusetts, to less expensive facilities in Connecticut. Petitioners later purchased Race Lane Farm in order to expand their operation and develop a successful horse business. Prior to the purchase, petitioners seriously considered several other properties and prepared projected budgets and operating statements which indicated that the horse operations at Race Lane Farm would be profitable. We conclude that petitioners carried on the horse activity in a businesslike manner and maintained accurate books and records. Factor (2): Expertise of the Taxpayer or His Advisors. Petitioners' involvement with horses began in 1963 when their daughter, Karen, started riding lessons. During the *510 period 1967 throughout 1973, petitioners considered purchasing a show horse for investment. They discussed the profit potential of buying a show horse, having it trained and later sold, with the owners and operators of the stables where their daughter's horse was boarded. During 1973 to 1979 all horses purchased by petitioners were selected, trained and shown by professional trainers other than petitioners' daughter, Karen. Petitioners continually educated themselves on how to train and show horses for a profit. They sought advice from their professional trainers and riders and attended horse shows in order to discuss with other investors the profit potential of purchasing, training and showing horses. Petitioners hired their daughter, Karen, a licensed professional rider with more than 15 years experience with horses, to manage the day to day operation of Race Lane Farm while Mr. Meagher managed the business' financial matters. We believe that the expertise of petitioners, which was developed through their involvement with show horses, their reliance on advisors and their continuous consultations with other trainers and investors, strongly indicates and actual and honest profit *511 objective. Factor (3): Time and Effort Expended by the Taxpayer in Carrying on the Activity.Prior to the purchase of Race Lane Farm, petitioners devoted only a small amount of time to their horse activities. However, since petitioners hired professional trainers and riders to develop and show their horses, it was not necessary for petitioners to become more involved in the day-to-day operations in order to demonstrate a bona fide intention to make a profit. Appley v. Commissioner,supra;Section 1.183-2(b)(3), Income Tax Regs.
When petitioners expanded their operations with the purchase of Race Lane Farm, they devoted a substantial amount of time and effort in operating their horse activities. Most of the labor for the initial improvements and maintenance of Race Lane Farm were supplied by petitioners and their daughter Karen. Mrs. Meagher lived and worked at Race Lane Farm for approximately two years. Mrs. Meagher's activities, which included acting as a ground coach, performing outside maintenance, overseeing children at lessons or horse shows and performing various other duties, constituted a full-time job. Mr. Meagher worked at Race Lane *512 Farm every weekend and, when required, during the week. His work included performing manual labor on improvements and maintenance at Race Lane Farm and maintaining financial records. Petitioners' daughter, Karen, who only received a small salary, worked long hours six to seven days per week in an effort to make the operation more successful. The significant amount of time and effort devoted by petitioners and their daughter to the horse activities is persuasive evidence of a profit objective.Section 1.183-2(b)(3), Income Tax Regs.
Factor (4): Expectation that Assets Used in Activity May Appreciate in Value. Petitioners intended to make a profit by purchasing horses, having them trained, shown at horse shows and later sold. Generally, when a horse is successfully shown, the value of the horse increases. Petitioners incurred substantial expenses in connection with the training and showing of their horses with the expectation that the value of their horses would increase. Two of petitioners' horses substantially appreciated in value. However, one of the horses, Breakaway, developed an ailment and had to be put down in 1981. The other horse, Applewood Imp, which was purchased *513 for $800 in 1979 was successfully shown and later insured by petitioners for $35,000. These facts further support our conclusion herein that petitioners' horse activities were operated with the intent to make a profit. Section 1.183-2(b)(4), Income Tax Regs.
Factor (5): The Success of Taxpayer in Carrying on Other Similar or Dissimilar Activities. Petitioners have not engaged in any similar horse activities in the past. Mr. Meagher, however, has invested in four real estate ventures in the past and petitioners realized a profit on three of these investments. In addition, Mr. Meagher manages his successful accounting practice. Mr. Meagher's success in these other businesses further supports petitioners' argument that their horse activity was engaged in for profit. Ellis v. Commissioner,T.C. Memo. 1984-50. Factor (6): The Taxpayers' History of Income or Losses with Respect of the Activity. Petitioners sustained a loss in each and every year since they became involved in the horse business. Generally, this would be considered a factor indicating that the activity is not engaged in for profit. However, a series of losses incurred during the initial *514 stage of an activity and losses sustained because of unforeseen or fortuitous circumstances beyond the taxpayers' control, do not necessarily indicate that the activity was not engaged in for profit. Engdahl v. Commissioner,supra at 669; section 1.183-2(b)(6), Income Tax Regs.
We believe the losses sustained by petitioners are understandable. While the realization of large profits from an investment in show horses is possible, such an investment must be considered speculative. Petitioners suffered a severe setback when their most successful and promising horse, Breakaway, had to be put down due to an unforeseen ailment. Petitioners' more substantial losses were realized in 1979 and 1980 after the purchase of Race Lane Farm. Since petitioners were unable to begin active operation of Race Lane Farm until September, 1979, the business was in the start-up phase of its operation during 1979 and 1980.Therefore, the fact that petitioners sustained a loss each year does not indicate that Race Lane Farm was not engaged in for profit. Factor (7): Amount of Occasional Profits, If Any, Which Are Earned. While petitioners realized a small gain on the sale of their *515 horse Tustin, they never earned a profit from their horse activities during any of the years at issue. Section 1.183-2(b)(7), Income Tax Regs., provides in relevant part as follows: an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Petitioners' investments in show horses was very speculative. However, there was the potential, while unrealized, that one or more of petitioners' horses would develop into an extremely valuable horse. Petitioners' horse, Breakaway, might have developed into such a horse had it not acquired an unforeseen ailment which required it to be put down. In addition, Applewood Imp has appreciated into a much more valuable horse and is insured for more than $34,000 in excess of its purchase price. This appreciation was not reflected in petitioners' horse operation losses since the horse was not sold during the years at issue. In consideration of these circumstances, we do not place as much weight on the lack of profits from petitioners' horse operations as we might under *516 other circumstances. Factor (8): Financial Status of the Taxpayer.While petitioners had substantial income from Mr. Meagher's accounting practice and the losses from their horse activities generated substantial "tax benefits," we believe petitioners held a genuine hope of realizing an economic profit from the activities. In Engdahl we stated: "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money. * * * The essential question remains as to whether there was a genuine hope of economic profit." 72 T.C. at 670. Petitioners had no other significant investments and substantially all of their income was generated by Mr. Meagher's accounting practice. Since petitioners' hourse activities have cost them substantial amounts of money and have demanded extreme personal labor and sacrifice, we are convinced they entered into this activity with the objective of making a profit. Factor (9): Elements of Personal Pleasure or Recreation. Respondent contends that petitioners received personal and recreational benefits from their horse activities and, therefore, that these activities were not engaged in for profit.However, the facts *517 do not support respondent's position. Petitioners do not ride horses. Their investment horses were trained and ridden by qualified professionals. Petitioners' daughter, Karen, rarely rode any of petitioners' investment horses. After purchasing Race Lane Farm, petitioners and their daughter, Karen, spent a significant amount of time performing manual labor in order to improve and maintain the facility. They did not entertain friends at Race Lane Farm and sacrificed their social life in West Boylston for their involvement in their horse activities. After consideration of the record as a whole, we conclude that petitioners pursued their horse activities with an actual and honest profit objective. II Since we have determined that petitioners' horse activity was engaged in for profit, we must next decide whether petitioners are entitled to (1) certain deductions for local automobile expense, food expense, and depreciation, and (2) certain investment tax credits. From our examination of the record as a whole, we are satsified that petitioners incurred substantial automobile expense in 1977 and 1978 in traveling to various horse shows and to the stables where their investment *518 horses were kept. We are also satisfied that petitioners incurred automobile expense in 1979 and 1980. However, we think the amount of such expense in the latter two years was substantially less, because by then petitioners' horse activity had become concentrated in West Barnstable and petitioners had much less occasion to incur deductible transportation expense. Accordingly, using our best judgment, we hold that petitioners are entitled to 80 percent of the automobile expense which they claimed on their 1977 and 1978 returns and 40 percent of the automobile expense which they claimed on their 1979 and 1980 returns. On their 1979 and 1980 returns, petitioners deducted $5,100 and $10,700, respectively, for food. These amounts were allegedly expended on behalf of petitioners' daughter Karen as well as petitioners themselves. Petitioners contend that most of the food expense was allocable to their daughter and that it is deductible because the food was compensatory in nature. They also contend that the part of the food expense which was allowable to Mr. Meagher is deductible as travel expense. [3] We disagree. In our view, the food expense is personal and therefore nondeductible *519 under section 262. The record before us does not provide any basis upon which the allocate the food expense among Mr. Meagher, Mrs. Meagher, and their daughter.[4] In any event, we are not persuaded that the food furnished to Karen by her parents, and to her mother with whom she lived, was intended to be compensatory. Rule 142(a).Finally, we do not think the good expense allocable to Mr. Meagher qualifies as travel expense. See Preseault v. Commissioner,T.C. Memo. 1975-146. Accordingly, respondent's determination on this issue must be sustained. On their 1979 and 1980 returns, petitioners claimed depreciation on the two-bedroom house, as well as on the furniture and fixtures therein, on RACE Lane Farm. They contend that the sole use of this property was for business purposes, and that it is therefore depreciable, because their daughter's job *520 required her to live on the premises and because the house was used by customers on nights before horse shows. We do not agree. The record is clear that Mrs. Meagher resided in the house on Race Lane Farm. Petitioners' daughter Karen also resided there. Although Mr. Meagher resided in West Boylston, he traveled to Race Lane Farm at least every weekend and presumably stayed with his family in the house. Petitioners' son Kevin was also at the farm during horse shows and for holidays. Given this use of the house, we simply cannot conclude that it was used in petitioners' horse activity for purposes of section 167. Steen v. Commissioner,61 T.C. 298 (1973), affd. per curiam 508 F.2d 268 (5th Cir. 1975); Russell v. Commissioner,T.C. Memo. 1982-709; Meeker v. Commissioner,T.C. Memo. 1981-215. The fact that the house may have been used by customers on nights before horse shows does not demand a different conclusion. First, the record does not clearly disclose the degree of such use. Second, horse shows were not that common an occurrence at Race Lane Farm. During the winter, shows were conducted about every six weeks, *521 while during the summer they were held less frequently. Third, the house had only two bedrooms, and both Mrs. Meagher and their daughter Karen resided there. In addition, we have no reason to think that Mr. Meagher and his son Kevin did not use the house when visiting the farm. We therefore think the use of the house by horse-show customers was inconsequential, and we decline to even attempt to allocate the basis of the house and its furniture and fixtures between personal and business use. See Steen v. Commissioner,supra, at 305. As the last order of business there remains for our consideration the allowability of certain investment tax credits. On brief, petitioners continue to argue for an investment tax credit in respect of only one remaining type of property, namely, the furniture and fixtures in the house on Race Lane Farm. However, we have already held that the furniture and fixtures were not used in petitioners' business and are therefore not subject to the allowance for depreciation. Accordingly, they do not qualify for the investment tax credit. [5] Section 48(a)(1).
*522 Given our disposition of the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for 1976-1980, unless otherwise indicated. ↩
2. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. On brief petitioners appear to concede that the part of the food expense which was allocable to Mrs. Meagher was personal and therefore nondeductible under section 262.↩
4. We are also not satisfied that the amount of expense for each year, which strikes us as excessive, has been adequately substantiated.↩
5. Should we be mistaken in our assessment that petitioners have abandoned their claim to investment tax credits in respect of other assets, suffice it to say that neither the arena nor the lighting installed therein qualifies as "section 38 property." The former is not a "single purpose agricultural structure," see section 48 (a)(1)(D); section 1.48-10(b), Income Tax Regs.; McKenzie v. Commissioner,85 T.C. 875 (1985); and the latter constitutes a structural component of a building, see section 48(a)(1)(B); section 1.48-1(e), Income Tax Regs.↩ Finally, petitioners have failed to show that respondent erred in disallowing 50 percent of the investment tax credit claimed in respect of an automobile.Rule 142(a).